**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------ X
CONOR DWYER REYNOLDS,                             :
                                                                          :
                                             Plaintiff,           :          Civil Action No.:
                                                                          :
                     v.                                            :          **COMPLAINT**
                                                                          :
CITY OF ROCHESTER, SHANI WILSON,      :          **Jury Trial Demanded**
DUWAINE BASCOE, DEBORAH                    :
CAMPBELL, DRORAH SETEL, MATTHEW      :
NICKOLOFF and NATALIE BANKS (in their  :
individual and official capacities)                   :
                                                                          :
                                             Defendants.      :
------------------------------------------------------------------ X

Plaintiff Conor Dwyer Reynolds hereby alleges as follows:

## PRELIMINARY STATEMENT

1.        Days after being hired at Defendant City of Rochester ("the City"), Mr.

Reynolds's supervisor – Defendant Shani Wilson – began making unwanted sexual advances

toward him as part of what her friends called an "obsession," and a "delusional" one at that.

2.        When Mr. Reynolds failed to give in to more than a year of persistent sexual

advances, Wilson – who has said her "job" was to serve as Mr. Reynolds's "dominatrix" by

"humiliat[ing]" him into "submission" – engaged in a range of misconduct the City has admitted

was "clearly inappropriate."  This misconduct included, among many other things, graphic

sexual remarks, inappropriate sexual contact, cruel rumors and jokes, exclusion from work

functions, orders to stop having sex with women, and pressure to have sex with men.

3.        When Mr. Reynolds stated his intention to complain about this behavior, did so

shortly thereafter, and went public with his story, Defendants subjected him to baseless

complaints, illegal orders to remain silent, an unjustified suspension, the public leak of his

personnel file, and a termination premised on obviously pretextual grounds.

1

4.      All of this happened despite Mr. Reynolds being, in his employer's words, a "role model" employee who was doing "miracle" work at his job, someone who had never before, in his entire career, faced a complaint or negative performance review.

5.      Unsurprisingly, the State of New York has found – not once, but twice – that there is probable cause to believe Defendants discriminated and retaliated against Mr. Reynolds.

6.      What Defendants did to Mr. Reynolds is also a perfect illustration of employer negligence.  Defendants knew that Wilson had a long history of engaging in heinous workplace misconduct similar to the behavior to which she subjected Mr. Reynolds.  Despite this knowledge, Defendants hired and retained her.  Worse yet, Defendants never provided training on sexual harassment and retaliation to any of the individuals responsible for supervising Mr. Reynolds or Wilson – despite the countless best practices, laws, policies and practices that required them to do so.

7.      What Defendants did to Mr. Reynolds goes far beyond a run of the mill case of negligence, retaliation, or discrimination.  In the words of City officials, Mr. Reynolds needed to pay a "heavy price" for "cast[ing] aspersions" on his powerful boss, who was a "best friend" of countless City officials.  That heavy price for reporting misconduct this: Mr. Reynolds being publicly "hurt," "lynch[ed]," "choke[d]," "destroyed," and "pu[t] out of [his] misery."

8.      Defendants exacted this toll on Mr. Reynolds by launching a six-month campaign to publicly discredit Mr. Reynolds's story, destroy his reputation, and end his career.  They falsely branded him as a liar, a criminal, a person with a loathsome disease, and an incompetent manager.  They asked their own employees, the public, and community leaders to lie about, isolate, and silence him.

9.      City Councilmember Kim Smith and Board member (and Defendant) Drorah Setel even attended a fundraiser held for Wilson while, at the same time, they were overseeing the investigation into her misconduct – an "investigation" that was opened only after Defendants had already declared his claims "unequivocally false." To conduct this investigation, the City hired a law firm that was also obligated to defend it against Mr. Reynolds's claims and an attorney who the City admitted had a "conflict of interest."

10.     Defendants' campaign against Mr. Reynolds was so ham-fisted that Defendants have been repeatedly forced to admit its baseless and punitive nature. For example, after learning of the complaints solicited against Mr. Reynolds, Defendants labelled those charges as "hyperbole" that merited a response of "So what?" Just after suspending Mr. Reynolds, Defendants stated that a reason for doing so "had not been defined." The day Defendants publicly labelled Mr. Reynolds's complaint "unequivocally false," they admitted privately that "many" of the allegations he made had, in fact, "occurred" – and later concluded that his boss had engaged in "clearly inappropriate" behavior. Shortly before disseminating unsubstantiated allegations against Mr. Reynolds to countless media outlets, Defendants admitted that their doing so "constituted an unwarranted invasion of privacy."

11.     Defendants were so single-mindedly focused on humiliating, silencing, and terminating Mr. Reynolds that they chose to openly violate his due process rights as an employee who, by statute, could only be fired for "good cause." It took Defendants four months after his suspension to give Mr. Reynolds any information about the charges against him; when they did, they omitted charges, misdescribed others, kept secret the evidence and witnesses against him, and rejected his request to make a response to the relevant decision makers. In addition to

3

stripping him of pre-disciplinary due process, Defendants refused to inform Mr. Reynolds of the reasons for his termination, hold an evidentiary hearing, or provide him with any form of appeal.

12.     When Mr. Reynolds told his boss he would be reporting her misconduct, she made him a promise: *"I'm going to hurt you because you hurt me."*  In fulfilling that promise, Defendants did not merely discriminate and retaliate against Mr. Reynolds, neglect duties of care owed to him, violate his due process rights, and defame him.  They did all of this with ill will, spite, and disregard for Mr. Reynolds's well-being so reckless that it is clear Defendants intended to inflict immense emotional distress upon him.  Their intentions were fulfilled beyond measure, causing massive damage to Mr. Reynolds's reputation, his body and psyche, his mental health and personal relationships and finances.

13.     In taking a job at Defendant City, Mr. Reynolds was asked to work to fix a longstanding problem within the City's police department – namely, that powerful officials are incapable of addressing misconduct by the powerful.  The story of his firing proves that this problem of City government is not limited to Rochester's police department.

## **PARTIES**

14.     Mr. Reynolds is an individual who resides in Rochester, New York. From October 16, 2020 to November 17, 2022, Mr. Reynolds served as the Executive Director of the Rochester Police Accountability Board ("the PAB") and, as such, was an employee of the City.

15.     Defendant City of Rochester was and is a municipal corporation located in Rochester, New York, and is organized under New York State law. The PAB is, by statute, an office of and within the City.

16.     Defendant Shani Wilson served as a PAB Board Member and as Chair of the Board from January 2020 to June 2022. In her capacity as Chair of the Board, Wilson served as

Mr. Reynolds's direct supervisor. Defendant Wilson is sued in her individual and official capacity.

17.     Defendant Duwaine Bascoe served as an attorney at the PAB from January 2022 to May 2022. From May 2022 until November 2022, Bascoe served as an "interim" or "acting" Executive Director of the PAB. Defendant Bascoe is sued in his individual and official capacity.

18.     Defendant Deborah Campbell served as the Director of Staff Support at the PAB from December 2021 to mid-2023.  Defendant Campbell is sued in her individual and official capacity.

19.     Defendant Drorah Setel has served as a PAB Board Member from January 2020 to the present. In her capacity as a member of the Board, Setel served as Mr. Reynolds's direct supervisor. Defendant Setel is sued in her individual and official capacity.

20.     Defendant Matthew Nickoloff served as a PAB Board Member from January 2020 to  January 2023. In his capacity as a member of the Board, Nickoloff served as Mr. Reynolds's direct supervisor. Defendant Nickoloff is sued in his individual and official capacity.

21.     Defendant Natalie Banks has served as the Chief of Public Affairs at the PAB from May 2021 to the present. Defendant Banks is sued in her individual and official capacity.

## ADMINISTRATIVE PROCEDURES

22.     Mr. Reynolds exhausted his administrative remedies and otherwise complied with procedural perquisites prior to filing this action. Mr. Reynolds filed a Notice of Claim with the City and two Charges of Discrimination with the New York Division of Human Rights ("DHR"), an administrative prerequisite to filing the discrimination claims at issue here under both New York State Human Rights Law and Title VII of the Civil Rights Act of 1964. DHR issued probable cause findings on both charges. Mr. Reynolds has received a dismissal for

administrative convenience and a Right to Sue letter. This Complaint was filed fewer than 90 days after his receipt of said Right to Sue letter.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction of Mr. Reynolds's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over Mr. Reynolds's state law claims pursuant to 28 U.S.C. § 1367.

24.     Equitable relief is authorized by 28 U.S.C. §§ 2201 and 2202, Rule 57 of the Federal Rules of Civil Procedure and the Court's inherent equitable authority.

25.     Pursuant to 28 U.S.C. § 1391(b) and (c), venue is proper in the Western District of New York because Defendants are located in this District and a substantial part of the events or omissions giving rise to this action, including the unlawful practices alleged herein, occurred in this District.

## FACTUAL ALLEGATIONS

**I.    THE CITY HIRES WILSON KNOWING THAT SHE HAS A HISTORY OF ENGAGING IN SEXUAL MISCONDUCT AND RETALIATORY BEHAVIOR**

### A.    The PAB Is Formed and the City Hires Wilson as the Chair of its Board

26.     In November 2019, Rochesterians overwhelmingly voted to create the PAB, an "autonomous office of the City" whose mission was to "ensure public accountability and transparency over the powers exercised by sworn officers of [the] Department." See Sections 18-1 & 18-3(B) of the Rochester City Charter.

27.     The PAB is run by a group of nine Board members who are – having been appointed by the Rochester City Council – ultimately responsible for running the PAB and conducting all "Board business."  See Section 18-6(B) of the Rochester City Charter.

28.     Some of the PAB's board members are nominated by the Police Accountability Board Alliance ("the Alliance"), a coalition of activists and organizations dedicated to supporting the PAB's work.

29.     All PAB Board members serve as "public officers" of the City. See Section 18-4(G) of the Rochester City Charter.

30.     PAB Board members were responsible for selecting, supervising, and overseeing an Executive Director who would "report" to the Board. See Section 18-6(C) of the Rochester City Charter.  The Board made this point clear in a presentation made to the public on June 16, 2022, which stated that the Board members had "the power to supervise the Executive Director and to direct the Executive Director."

31.     PAB Board members are led by a Chair who, among other things, was responsible for: (i) "leading the search for and evaluation of" the Executive Director; and (ii) serving as "the link" between Board members and the Executive Director. See Section (A)(2)(a) of the PAB's bylaws.

32.     Between November 2019 and January 2020, the City – by and through members of its City Council – interviewed a range of candidates to serve as PAB Board members, including Wilson.

33.     Wilson was appointed as a PAB Board member in January 2020 and, weeks later, was appointed as Chair of the PAB Board.

34.     In appointing Wilson as a PAB Board member, City officials were empowering an individual with deep friendships and ties across City government – including to those directly responsible for appointing, supervising and retaining her as the Chair of the PAB.

35.     For example, Wilson is a self-described "best friend" of City Councilmember Mary Lupien, a longtime associate of City Councilmember LaShay Harris, and a close friend of then-City Council Chief of Staff B.J. Scanlon.

36.     Wilson was also a self-described "best friend" and "soul mate" of Smith, who became a City Councilmember in January 2022.

37.     Wilson is a self-described "best friend" of Board members Nickoloff and Setel, both of whom were appointed as PAB Board members alongside Wilson in January 2020 and served in those roles throughout Mr. Reynolds's tenure as Executive Director.

38.     In addition, during her time on the PAB Board, Wilson befriended a host of other PAB Board members, City Councilmembers, and City officials – including Mayor Malik Evans, whom she said "owed her" for her support of him in the local LGBTQ community.

39.     Many of these friends and associates – along with Wilson's many close friends in state and local government, including in the Monroe County and New York legislatures – provided Wilson with emotional, financial, and political support throughout her tenure at the PAB.

40.     Indeed, City officials advocated for Wilson's appointment as a PAB Board member, supported her appointment as PAB Chair, threw her birthday parties, provided her with financial support, called upon the public and those in power to praise and support her, and urged her to run for public office.

41.     As Wilson would tell Mr. Reynolds, these "friends" in City government would "always protect" her by ensuring that she was appointed and retained as a PAB Board member.

**B.     Wilson's History of Sexual Misconduct and Retaliation Was Known By the City at the Time of Her Appointment**

42.     At the time of Wilson's appointment as a Board member and Chair of the PAB, she worked as a physician's assistant at Trillium Healthcare ("Trillium"), which specializes in mental health treatment.

43.     In that position Wilson engaged in a wide range of misconduct and retaliation.

44.     Among other things, Wilson defamed co-workers by making false statements about their competency and solicited baseless complaints against co-workers in efforts to punish or get them terminated.

45.     Wilson herself discussed the latter with Mr. Reynolds.

46.     Specifically, she told Mr. Reynolds that while she was working for Trillium, she solicited colleagues to make complaints about Dr. Robert Biernbaum, who was the Chief Medical Officer of Trillium and with whom Wilson engaged in a sexual relationship. Wilson solicited these complaints after Dr. Biernbaum ended the relationship and began to reject her sexual advances.

47.     Wilson's efforts eventually resulted in Dr. Biernbaum's termination, which she openly celebrated at the PAB's offices in front of Mr. Reynolds.

48.     Another target of Wilson's abuse was a former member of Trillium's leadership team. He was so traumatized by Wilson that, to this day, he "live[s] in fear" of her.

49.     Wilson's workplace misconduct was so egregious and widespread that it led to her departure from Trillium.

50.     That departure, and the complaints and circumstances behind it, were a matter of common knowledge among Wilson's co-workers, patients, friends, and those responsible for

appointing, retaining, and supervising Wilson – including individuals serving on (or working for) the Rochester City Council and the PAB Board.

51.     One of the individuals with knowledge of Wilson's misconduct at Trillium was her "best friend," Councilmember Smith. As explained in detail below, despite knowing of these issues, Councilmember Smith would later go on to urge her colleagues in the City Council to support Wilson and retaliate against Mr. Reynolds for exposing her ongoing sexual misconduct at the PAB. She was also on the Select Committee responsible for overseeing an investigation into Mr. Reynolds, an obvious conflict of interest.

52.     Another individual with knowledge of Wilson's misconduct at Trillium was another one of her "best friends," Councilmember Lupien. Also as described in further detail below, Councilmember Lupien would later be seen on social media hugging and praising Wilson while, at the exact same time, she was responsible for implementing any recommendations flowing from an investigation into Wilson's misconduct at the PAB – another obvious conflict of interest.

53.     A third individual who was aware of Wilson's prior misconduct was yet another "best friend," Board member Nickoloff. Although he would concede to Mr. Reynolds in a meeting held in March 2022 that Wilson was a "tyrant," Nickoloff also would later support Wilson by blatantly retaliating against Mr. Reynolds and, *inter alia*, illegally ordering him not to discuss his allegations of sexual harassment with PAB employees.

54.     Board member Setel – a fourth "best friend" – also knew of Wilson's workplace misconduct.  Although she would concede to Mr. Reynolds that Wilson was an "autocrat" in a meeting held in March 2022, she would go on to support Wilson by blatantly retaliating against Mr. Reynolds, which ultimately led to his unlawful suspension and termination.

55.     Finally, upon information and belief, Scanlon, the former Chief of Staff to the City Council, who was tasked with running the process for selecting PAB Board members, also knew about Wilson's workplace misconduct. In fact, Scanlon was serving as the Chair of the Board of Trillium at the time of the misconduct. Incredibly, despite his knowledge, and his role in the PAB Board member selection process, Wilson was still appointed to the PAB Board.

### C.     The City Fails to Adequately Investigate and Train PAB Board Members

56.     Perhaps because of these deep-seated friendships and incestuous relationships, before appointing Wilson, the City never asked Wilson (or any other candidates for PAB Board membership) questions about their prior employment experience, supervisory skills, or whether they had been the subject of accusations, complaints, or discipline regarding workplace misconduct – including misconduct relating to sexual harassment, retaliation, or inappropriate workplace relationships.

57.     Nor did the City contact the current or former employers or co-workers of Wilson or any other candidates to determine if they had been the subject of accusations, complaints, or discipline regarding workplace misconduct.

58.     In fact, the City effectively conducts no substantive background check on any of the individuals appointed to serve as members of City commissions or Boards, despite the fact that these individuals often interact with and supervise City employees.

59.     Any reasonable person with the knowledge (or reason to have knowledge) of Wilson's workplace behavior would never have appointed or retained Wilson in her position as a supervisor in City government – and would foresee that placing her in such a position would likely make her subordinates into victims of her longstanding pattern of workplace misconduct.

60.     To make matters worse, between January 2020 and June 2022 – that is, the entire period of Wilson's affiliation with the PAB – the City never provided her with any training regarding sexual harassment or retaliation.[1]

61.     Board member Nickoloff affirmed these findings during a public meeting held on October 20, 2022.  In discussing "critique[s]" about the "lack of oversight" of the PAB's Board members and how they had "messed this up," Nickoloff said that, when it came to the PAB, the City "rush[ed] this thing out" to the point that "the Board was not actually provided initial training or guidance" it required.  New Board members, he said, needed to be "trained better than we were, which means being trained at all, frankly."

62.     "When people talk about the fault of the Board," Nickoloff said, "it doesn't just rest with the people who are on the Board, but also the way that the Board was set up" by the City.

63.     PAB Board member Arlene Brown shared Nickoloff's sentiments during a public meeting on December 1, 2022, "One of the things I got blindsided with was the sexual harassment," Brown said, "and I would like very much to see us get some additional training on how to handle those kinds of things."

64.     Upon information and belief, the City Councilmembers responsible for funding and working with the PAB – before and during the time of Mr. Reynolds's employment – were also never trained on sexual harassment, retaliation, or how to handle workplace complaints.

---

[1]     In response to Mr. Reynolds's complaint, however, Defendants falsely told state investigators on November 29, 2022 that the City "provides sexual harassment training yearly to all employees and Board members."  This statement was false – and Defendants knew so when they made it.  Indeed, just two weeks earlier, Defendants had publicly stated that, "PAB Board members reported never receiving City of Rochester training regarding any policies or practices." Defendants concluded that, as a result of this failure to train, Board members were "not able to properly oversee the activities of the PAB."

65.     These failures were a blatant violation of the New York State Sexual Harassment Law, which requires employers like the City to provide "sexual harassment prevention training . . . on an annual basis."

66.     Without ensuring their employees, manager, supervisors, and agents received this training, it was foreseeable that employers like the City would – according to the State – further "sexual harassment in the workplace" and contribute to a "culture of silence that victims face." That is exactly what happened to Mr. Reynolds.

## II.     WILSON LAUNCHES A CAMPAIGN OF SEXUAL HARASSMENT

### A.     Mr. Reynolds is Hired as PAB Executive Director and Wilson Promptly Warns Him that He Would Need to Be "Nice" to Her

67.     In early 2020, Mr. Reynolds was working as a Clinical Lecturer in Law at Yale Law School. There, he ran the school's Environmental Protection Clinic, overseeing a team of faculty, fellows, and over thirty students.

68.     Before taking a job at Yale, Mr. Reynolds had worked in the White House and for the federal judiciary, a national law firm, the University of Rochester and a host of clients *via* political consulting work.

69.     Throughout his career, Mr. Reynolds consistently received stellar performance reviews and evaluations from his clients and supervisors. He had never been the subject of a workplace complaint or negative performance review.

70.     During his time working at Yale, Mr. Reynolds learned that the City was looking to hire an Executive Director for the PAB.

71.     After a City Councilmember urged him to apply for the position, Mr. Reynolds submitted his application.

72.     In reviewing over 150 applications, City officials quickly determined that Mr. Reynolds was – in the words of PAB Board member Bob Harrison – the Board's "number one and really [ ] only choice" for the position.

73.     During the application process, Mr. Reynolds was interviewed by Wilson and other PAB Board members.

74.     In October 2020, Wilson called Mr. Reynolds to inform him that the PAB Board had selected him to serve as the agency's Executive Director.

75.     In her role as Chair, Wilson was consistently acknowledged – by herself, her fellow Board members, and countless other City officials – as the "boss" of the PAB's Executive Director, *i.e.*, Mr. Reynolds. Accordingly, Wilson exercised supervisory control over Mr. Reynolds's work, including by, among other things, giving him instructions via email, text and phone call, defining the scope of his work duties and obligations and approving his requests for accommodations, leave and modified work schedules.

76.     A few days after Wilson informed Mr. Reynolds that he would be hired as the PBA's Executive Director, Wilson met with Mr. Reynolds at a local café to lay out her "vision" for his work at the agency.

77.     Wilson told Mr. Reynolds that some City officials were "hostile" to the PAB's success, and that the Executive Director could only be "protected" from political interference if Wilson used her "connections" to remain "leader" of the agency.  Among those whom Wilson identified as being "hostile" to the PAB's success were: (i) then-Mayor Lovely Warren, who had openly opposed the version of the PAB voters enacted into law; (ii) Warren's then-Deputy Mayor, James Smith (who later became City Council Chief of Staff); (iii) then-Corporation

Counsel, Tim Curtin; (iv) then-City Council Vice President Willie Lightfoot; (v) City

Councilmember Mitch Gruber; and (vi) then-Councilmember – and now Mayor – Malik Evans.

78.     Wilson then told Mr. Reynolds that in order to succeed at the agency, he would

have to be "friends" with her.

### B.     <u>Wilson Immediately Subjects Mr. Reynolds to Unwanted Sexual Advances</u>

79.     Mr. Reynolds began employment with the City on October 16, 2020.

80.     In announcing Mr. Reynolds's selection, the City issued effusive praise of his

work experience and talents as a manager, telling the public that Mr. Reynolds had "proven in a

diversity of contexts that his considerable talent is rooted in a keen interest and willingness to

listen deeply, and learn with humility across lines of race, gender, ability, and socioeconomic

conditions."

81.     Less than one week later, on October 22, 2020, Mr. Reynolds attended a morning

meeting with Wilson and a local pastor involved in the local police accountability movement.

After that meeting ended, Wilson asked Mr. Reynolds to accompany her on a walk in a local

cemetery to "talk about work."

82.     In the cemetery, however, Wilson quickly turned the conversation toward her own

sexual history and preferences.

83.     Wilson discussed, in graphic detail, her sexual history with her ex-husband, the

sexual orientations and habits of past co-workers and her own sexual preferences.

84.     Mr. Reynolds, disturbed by Wilson's talk, attempted to change the conversation.

85.     Wilson replied by telling Mr. Reynolds that he "needed to hear this" if he was to

be – as his position "required" – the "friend" of the PAB's Chair.

86.     After the walk ended and Mr. Reynolds went to his car to leave, Wilson asked him to sit on a bench near the cemetery parking lot to "talk about something important."

87.     On the bench, Wilson disclosed her own sexual orientation and asked Mr. Reynolds if he was "straight."

88.     When Mr. Reynolds resisted disclosing his sexual identity, Wilson reassured him that – as a "leader in the queer community" – she could "help protect" him if he were to disclose his identity to her.

89.     When Mr. Reynolds stated that he was bisexual, Wilson commented: "I knew it! You know you are a unicorn, right?"

90.     After talking about the rarity of bisexual men, Wilson stated: "Unicorns like you are attractive to people like me."

91.     Mr. Reynolds, uncomfortable but hoping Wilson meant no harm, said that he needed to head home and was thankful we could "frame ourselves as friends."

92.     At 12:50 PM that afternoon, Wilson texted Mr. Reynolds to ask what she admitted was a "dicey" question about "being friends and framing that." Specifically, Wilson asked: "Does that [being friends] even need to be framed?"

93.     Mr. Reynolds, concerned that Wilson was attempting to push back on the boundary he had established earlier in the day, replied: "I am your employee and occasionally your lawyer. More importantly, I am your friend."

94.     Mr. Reynolds believed this text would be a firm and final statement that he did not want a romantic relationship with his boss.

95.     This belief was soon proven unfounded.

96.     On November 19, 2020 at 11:31 AM, Wilson called Mr. Reynolds to tell him that they would need to meet over the weekend to discuss work matters.

97.     The next day at 3:56 PM, Wilson called Mr. Reynolds to say she would be buying dinner for him from a local Chinese restaurant so they could have a "working meal" at his house. After Mr. Reynolds agreed to the meeting, Wilson asked if Mr. Reynolds "want[ed] something to drink." Via text, Mr. Reynolds, who does not drink alcohol, declined, saying "I've got water!"

98.     At approximately 6:30 PM, Wilson arrived alone at Mr. Reynolds's house with dinner and a bottle of red wine.

99.     At the time, Mr. Reynolds was on the phone with his sister, who heard Wilson complaining that she would have to be a "hipster" and use a mason jar to drink out of because Mr. Reynolds did not own any wine glasses. Before ending the call, Mr. Reynolds's sister heard Mr. Reynolds decline Wilson's request for him to "start drinking."

100.    As Mr. Reynolds ate dinner, Wilson began drinking and continued to ask Mr. Reynolds to join her. Mr. Reynolds consistently declined.

101.    When dinner ended around 8 PM, Wilson asked Mr. Reynolds to go into his office – which Wilson had learned was connected to Mr. Reynolds's bedroom – to talk about work more and "listen to music."

102.    Upon entering the office, however, Wilson stopped talking about work. After a brief discussion of music, Wilson turned the conversation to her dating history, with particular focus on a past partner she believed Mr. Reynolds knew from college.

103.    When Mr. Reynolds confirmed that he knew Wilson's previous partner, Wilson began talking about the explicit details of that friend's sex life.

104.    Uneasy, Mr. Reynolds moved away from Wilson, into the corner of the room, and called his sister at 8:27 PM. Over the next 23 minutes, Mr. Reynolds's sister overheard Wilson talking about the sexual activities of others and Wilson's continuing requests for Mr. Reynolds to "drink some wine."

105.    Immediately after Mr. Reynolds ended the call with his sister, Wilson began asking questions about Mr. Reynolds's sexual orientation and gender identity, including questions about whether he had ever fantasized about having different genitalia or using hormones to change his gender presentation. Mr. Reynolds, who by that point was incredibly uncomfortable, deflected.

106.    Wilson then told Mr. Reynolds she had "something she'd been meaning to ask him."

107.    After referencing difficulties she had with her "straight" past partners and her resulting search for a "unicorn," Wilson said, "Conor, I have feelings for you." Wilson then stood up, walked towards Mr. Reynolds's bedroom, and asked if Mr. Reynolds "wanted to act on those feelings."

108.    Mr. Reynolds, walking in the opposite direction toward the kitchen, said he wanted to "just be friends."

109.    Wilson responded by saying she was "embarrassed" and began to cry. Mr. Reynolds assured Wilson that it "would be okay," and that "being friends," which would mean "no more dinners" at his home, would be better for PAB.

110.    Before leaving, Wilson gave Mr. Reynolds an unsolicited, unwanted hug that involved her rubbing her breasts up and down on Mr. Reynolds's chest. In the days after Wilson propositioned Mr. Reynolds, he told family members, close friends, and his therapist about

Wilson's advances. After telling his sister on Sunday, November 22, 2020, she texted Mr. Reynolds: "Dear god[.] Sure you okay?"

111.    On December 3, 2020, Wilson texted Mr. Reynolds to ask about "[her] coming over [to] [his] house." Mr. Reynolds did not invite Wilson to his house.

112.    On December 4, 2020, Wilson texted Mr. Reynolds to ask him to come to a gathering that was "not a meeting as so much it is just normal people getting together." Mr. Reynolds declined.

113.    On December 5, 2020, at 10:15 PM, Wilson texted Mr. Reynolds to "come over!" Mr. Reynolds declined.

114.    Mr. Reynolds also declined several other invitations to "hang out" made *via* phone by Wilson in late November and early December.

115.    By mid-December, Wilson began retaliating against Mr. Reynolds for rejecting her sexual advances. Wilson would ignore him in work meetings, make what she called "lighthearted jokes" that criticized his dress and appearance, and cancel last-minute work meetings even though she knew Mr. Reynolds needed her help.

116.     On December 17, 2020, at 8:30 PM, Wilson texted Mr. Reynolds to ask him to talk because, "I have some things I have to say to you."

117.    In a subsequent call, Wilson berated Mr. Reynolds for "being so distant" and "hurting [her] feelings" by not responding to her sexual invitations.

118.    Mr. Reynolds said he was "trying to keep things professional" because he felt "uncomfortable" with Wilson's advances. When Wilson asked why they needed to keep things "professional," Mr. Reynolds told Wilson that it was "inappropriate" for a boss to make advances on a subordinate and that she needed to stop.

119.   Wilson replied, "Oh god. I feel so guilty. You're making me hate myself." Wilson further said, "this had happened to me before."

120.   Mr. Reynolds repeated his request to "just be friends" – and that Wilson "respect [his] boundaries" by not making further advances toward him.

121.   To be clear, at no time did Mr. Reynolds have, express or act on any romantic or sexual interest in Wilson.

### C.   A "Delusional" Wilson Attempts to "Humiliate" Mr. Reynolds into "Submission"

122.   Wilson did not keep her feelings for Mr. Reynolds – or her anger that he had rejected her advances – a secret.

123.   By way of example, Wilson told her then-friends that she was in love with Mr. Reynolds – and that it was only a matter of time before he reciprocated her feelings. These individuals included, among others, a former Policy Analyst with the PAB.

124.   One of Wilson's closest friends referred to the idea that Mr. Reynolds would eventually succumb to her advances "delusional behavior."

125.   Wilson also told at least one friend (Rev. Lane-Mairead Campbell) and at least one of Mr. Reynolds's employees (Bascoe) that her "job" was to serve as Mr. Reynolds's "dominatrix" and "humiliate" him into "submission."

126.   In addition, Wilson told at least one of Mr. Reynolds's employees that she was "angry" about the fact that Mr. Reynolds had rejected her advances.

127.   In December 2020, Wilson made a surprise visit to Mr. Reynolds's home to give him an unsolicited gift. As was witnessed by his sister, Mr. Reynolds had to physically prevent Wilson from trying to enter his home uninvited. Days later, Mr. Reynolds decided to move to a

new apartment and, for fear of Wilson again trying to enter his home, made sure to never disclose his new address to her.

128.    Between December 2020 and April 2021, Wilson made a long string of invitations to Mr. Reynolds – *via* text message and telephone call – asking him to come over to her house late at night, requesting invitations to his house and otherwise asking Mr. Reynolds to meet for alone purposes unrelated to work. Mr. Reynolds rejected all of these advances.

129.    On April 26, 2021, Wilson texted Mr. Reynolds a request to meet. Believing this was to discuss the work they had been conducting that day, Mr. Reynolds replied, "Yes." Wilson then replied: "This is not about work. So you can always say no, I should have said that at the beginning." Mr. Reynolds, fearing additional retaliation if he declined, confirmed his earlier acceptance, texting Wilson: "Okay okay fine. I'll do it."

130.    At a meeting held in public days later, Wilson stated she was "over" her feelings for Mr. Reynolds. Wilson then promised Mr. Reynolds she would not talk about her sex life or romantic interest in him. However, Wilson also again told Mr. Reynolds that he needed to "act like a friend" toward her if he wanted to be "successful" as Executive Director. Wilson said Mr. Reynolds could "be a friend" by attending a book sale hosted by someone Wilson knew.

131.    On May 3, 2021, Mr. Reynolds and his friends attended the book sale as requested by Wilson. At the event, Mr. Reynolds's friends observed Wilson following Mr. Reynolds at the event and touching him in ways that appeared inappropriate and unwanted.

132.    Later that day, Mr. Reynolds went on a dinner date with a fellow Rochesterian. Minutes later, he received a text from Wilson stating: "So…..how was dinner? 😒 🤣" Wilson later contacted Mr. Reynolds's date and told her she was "hurting" Wilson by dating Mr. Reynolds, given that Wilson was "in love" with him.

133.    At a subsequent work meeting held at a local coffee shop, Wilson berated Mr. Reynolds for "fucking a woman I know," as Wilson explained that she "still had feelings" for Mr. Reynolds. Wilson told Mr. Reynolds that she "would not talk to" him in any capacity if he continued to engage in a romantic relationship with another woman.

134.    Forced to choose between his job and dating romantically, Mr. Reynolds decided to end the relationship. In response, the individual he had been dating texted him a request to continue the relationship while hiding it from Wilson. Mr. Reynolds declined, fearing what Wilson would do in response. Wilson and the City would later tell the New York State Division of Human Rights that the friend ended the relationship and was not interested in seeing Mr. Reynolds romantically. The aforementioned text exchange puts the lie to that claim – as does the City's own conclusion in November 2022 that "Dwyer Reynolds' allegation that Wilson pressured him to end a romantic relationship with her friend was corroborated."

135.    The following day, during a "work meeting" at which Wilson requested his presence, Wilson asked if Mr. Reynolds had ended the relationship and expressed pleasure he had done so. Wilson, noting Mr. Reynolds's bisexuality, told him that she wanted him to "hook up" with men.

136.    On May 23, 2021, Mr. Reynolds received an unsolicited text from a man saying: "So Shani tells me you haven't had the chance to meet much of the community since you came to [Rochester]. Now that things are opening up again we should change that!" Mr. Reynolds, uncomfortable with his boss's attempt to dictate the terms of his sexuality, did not reply. At a work meeting days later, Wilson chastised Mr. Reynolds for not taking her up on "her offer" and saying Mr. Reynolds was "missing out" on "being gay."

137.     On June 6, 2021, Mr. Reynolds visited a flea market with a friend. Mr. Reynolds was unexpectedly approached at the event by Wilson. Again, as confirmed by a witness, Wilson touched Mr. Reynolds in ways that were inappropriate, unwanted, and flirtatious.

138.     On June 26, 2021, Wilson invited Mr. Reynolds to the home of Victor Sanchez, a local political figure. Wilson told Mr. Reynolds that he would need to "connect with" individuals at the event for professional purposes.  Mr. Reynolds arrived to find that Wilson had apparently told several of the men at the event he was, in sum and substance, "single and ready to mingle." Uncomfortable with the physical attention he received, Mr. Reynolds left the event shortly after arriving. As he did so, Wilson said that attendees "being handsy just means they like you."

139.     On July 15, 2021, Wilson called Mr. Reynolds and yelled at him for "playing games with [her] emotions" because he had told a female employee – PAB's Chief of Public Affairs, Natalie Banks – to work on a project without Wilson's assistance. When Banks reported to Mr. Reynolds that Wilson had made a threatening phone call to her, Mr. Reynolds met with Wilson the following day to tell her that "whatever confusion or anger [you have] with me" should not "roll on to" female employees. After Wilson promised to apologize to the employee directly, Mr. Reynolds emailed her to say he was "address[ing]" the "hostility" Wilson had exhibited.

140.     On August 21, 2021, Wilson asked Mr. Reynolds to attend Rochester's Puerto Rican Festival so he could meet local leaders, including then-County Legislator Ricky G. Frazier, for work purposes. When Mr. Reynolds arrived, Wilson told him she would be introducing him to "some good gays," a few of whom she noted were "single." After briefly introducing himself to the local leaders he had been told were in attendance, Mr. Reynolds chose to immediately leave the event despite Wilson's request that he "stay" to "meet the gays."

141.    In response to Mr. Reynolds's refusal throughout summer 2021 to reciprocate Wilson's feelings or the submit to her desire that he engage in same-sex sexual activity, Wilson subjected him to a range of punitive and humiliating behavior, including additional unwanted touching and "friend hugs" like the one given on the night Wilson originally propositioned him. Wilson refused to talk to Mr. Reynolds about important work projects and ignored work-related calls. She ridiculed his appearance through jokes at work meetings, making fun of his weight, eating habits and way he cut his hair.

142.    When Mr. Reynolds told Wilson that her actions were hurting him and his ability to do his work, Wilson replied by saying that it was "his job" to "take abuse" from her because "her job" was to "be a boss bitch."

143.    On August 31, 2021, Mr. Reynolds met Wilson at a local coffee shop at her request. Wilson said she was "angry" at Mr. Reynolds for his being a "bad friend" and having "disrespected" the fact that Wilson "still had feelings" for him. As he had done in October 2020, November 2020, December 2020, April 2021 and May 2021, Mr. Reynolds told Wilson he was not interested in a sexual or romantic relationship with her. Wilson replied by telling Mr. Reynolds to "not talk about" his discomfort at her continuing expression of sexual and romantic interest because it was "manipulative" for him to do so.

144.    On September 30, 2021, Wilson called Mr. Reynolds to say there were "important people" at a local event Mr. Reynolds needed to meet. When Mr. Reynolds arrived around 11 PM, Wilson told him that a local political figure in attendance – Ravi Mangla – was "good at eating pussy." This followed an earlier text message from Wilson sent on August 19, 2021 about Mangla's being "good in bed."

145.    This was one of many unsolicited and unwanted remarks Wilson made to Mr.

Reynolds (and many others) about the sexual behaviors of Rochesterians involved in his work.

Shortly after December 1, 2021, Wilson told someone that Mr. Reynolds worked with that he

was sexually and romantically interested in them. Mr. Reynolds had no interest in this person

and had never expressed any interest in them to anyone. Nevertheless, Wilson encouraged this

person to sexually pursue "her subordinate," referring to herself as Mr. Reynolds's "dominatrix."

146.    Mr. Reynolds's hopes that the winter 2021-2022 resurgence of the coronavirus

would create needed distance from Wilson were dashed on March 4, 2022. The night before,

former PAB Board member Ida Perez had resigned in protest of what she believed was unethical

behavior on the part of Wilson and two of her friends in City government, Nickoloff and Setel.

In a meeting at a café on 240 East Main Street, Mr. Reynolds told Wilson that she needed to

apologize to other Board members for her behavior. Wilson replied by saying "fuck off," telling

him she would "punish" him for "the way [he] treated her feelings," and threatening to hit him in

his face.

147.    Four days later, on March 8, 2022, three female PAB employees informed Mr.

Reynolds that they believed their supervisor – Chenoa Maye – was creating a "dehumanizing"

workplace environment for subordinates that violated the City's anti-bullying policies. As Maye

would later inform Mr. Reynolds, she had "friends in City government" – including Wilson.[2]

---

[2]    Indeed, months earlier, in November 2021, Wilson had texted Mr. Reynolds that Maye was a "strong candidat[e]" who had been endorsed by a powerful member of the local Democratic Party, then-City Attorney Shani Curry Mitchell. When the City's corporation counsel informed Mr. Reynolds that Maye had been "fired" from previous employment at the City, Wilson instructed Mr. Reynolds to say this was a lie and hire Maye anyway. Then, upon Maye's hiring in February 2022, Wilson immediately pushed Mr. Reynolds to give her a promotion. A month later Wilson asked Mr. Reynolds *via* text message to have Maye functionally serve as the PAB's second-in-command.

148.     When Mr. Reynolds learned of the allegations against Maye – and, shortly thereafter, Maye's own complaint against one of her subordinates – he consulted with the City's Employee Office of Public Integrity about next steps. He then asked PAB's Director of Staff, Defendant Deborah Campbell, to begin an investigation.

149.     On March 18, 2022, Wilson called Mr. Reynolds to ask him to disclose the names of the individuals who had made complaints about Maye. When he refused to do so, Wilson threatened him, saying: "If you do anything to [Maye], you are going to have a lot to explain to the Board." Mr. Reynolds responded by saying, "You just threatened me for protecting employees." Wilson responded by hanging up the phone.

150.     The next day, March 19, 2022, was the date of a work event at a local museum that PAB Board members asked Mr. Reynolds to attend with Wilson. Unbeknownst to Mr. Reynolds, Wilson had informed her closest friends that she expected the event to be the night when Mr. Reynolds would submit to her.

151.     Unsurprisingly, after an uncomfortable Mr. Reynolds refused to give Wilson a ride to the event, she began to degrade and humiliate Mr. Reynolds. Upon his arrival, she asked him about the way her breasts looked in her dress. She then told him he looked "stupid," forced him to carry her personal belongings, and told him he would "be in trouble" if he did not remove her shoes from her feet and obtain flip-flops for her from her car.

152.     At the end of the event, Mr. Reynolds declined Wilson's request to "take [her] home."

153.     In the days after this rejection, Mr. Reynolds's workplace environment deteriorated. Wilson's friend on his staff, Maye, began subjecting him to the same kind of humiliation he experienced from Wilson. For her part, Wilson excluded him from important

meetings with City Councilmembers regarding the agency's budget and operations. When Wilson would come into the PAB's offices, she would speak with other staff while ignoring Mr. Reynolds.

154.    For example, on or about April 12, 2022, Wilson berated Mr. Reynolds publicly at a local café.  Later, Wilson refused to speak with Mr. Reynolds for an hour. When Mr. Reynolds asked if this was "punishment" for his rejection of her, Wilson replied, "It is."

## III.    DESPITE IMMENSE COSTS, MR. REYNOLDS DOES "MIRACLE" WORK AS "ROLE MODEL" EMPLOYEE

155.    Wilson's 18-month campaign of harassment caused Mr. Reynolds immense suffering and harm. He moved apartments after Wilson attempted to force her way into his home, fearing what she would do if she discovered his new address. He became unable to engage in romantic relationships of any duration, scared that Wilson would punish him or his partner. He lost interest in the things he loved, like attending events in the local queer community, hiking, and cycling. He had nightmares, gained weight, lost hair, and experienced spells of uncontrollable fear.

156.    By the end of summer 2021, the toll of this workplace hostility was becoming clear to those around Mr. Reynolds. For example, when his sister texted him on August 27 to ask if he was "okay" given his consistently "sour mood[s]," Mr. Reynolds explained that he was again facing "questionable workplace behavior from Shani." One night that summer, his sister would find Mr. Reynolds crying on the floor of his apartment, saying that he couldn't keep working with Wilson because of what she was making him endure.

157.    By winter 2021, the abuse and humiliation Mr. Reynolds was experiencing at work began having serious psychological side effects, including flashbacks so debilitating they

27

led to suicidal ideation.  During one episode, Mr. Reynolds's sister found him "in complete distress" and "look[ing] like a deer in the headlights."

158.    This, in turn, led to his being diagnosed with post-traumatic stress disorder in December 2021, his stay in a partial hospitalization program in January 2022, and a doctor's suggestion that he stop working at the PAB because of how triggering it was for his disorder. The effects of this diagnosis and its treatment caused Mr. Reynolds to, in a particularly humiliating moment, ask the cause of much of his suffering — Wilson herself — for a disability accommodation relating to his work schedule.

159.    Despite these harms, Mr. Reynolds was deeply reluctant to formally complain about Wilson's behavior. As he had seen through Wilson's treatment of co-workers, both at the PAB and her former workplace, Mr. Reynolds knew that her standard response to a complaint was to retaliate and force the complainant out of a job. He also had seen the price paid by others who had spoken up about sexual harassment experienced at the hands of politically powerful people like Wilson. As he wrote in a note: "If it were ever my word against hers, I'd likely end up without a job and without a future in Rochester, disbelieved by just about every person with a connection to my work at PAB."

160.    Mr. Reynolds also endured Wilson's harassment, as he told his sister in summer 2021, because of his commitment to his work at the PAB — what he called his "dream job." He knew that, even in the best scenario, a complaint against Wilson would jeopardize the viability of the fledgling, desperately needed agency he had been tasked with building. Mr. Reynolds was willing to do anything, including suffering Wilson's harassment, to ensure his hometown received the police oversight it deserved.

161.     Mr. Reynolds's commitment to his work was reflected in a list of remarkable achievements. As the Executive Director, Mr. Reynolds drafted and released a comprehensive reform plan for the Rochester Police Department. He held the first-ever oversight hearing of the police department led by unelected civilians. He launched civilian-led investigations into the police department's policies and procedures. He lobbied for, and obtained, first-of-its-kind state funding for a local police oversight agency.

162.     Most importantly, Mr. Reynolds built a new government agency from the ground-up essentially on his own. At one time or another, he performed every feature of every job necessary to expand the agency from an entity with a $350,000 budget and a single staffer to one with a $5 million budget and over 30 staffers. He drafted comprehensive planning and policy documents, devised and obtained the largest budget ever given in the United States to a police oversight agency on a per capita basis, created and executed communications strategies, created and ran a candidate recruitment, interviewing, and hiring process, facilitated Board meetings, served as a liaison to community groups and interagency task forces, managed consultants in creating a training program, procured office space and equipment, and supervised employees.

163.     In performing this extraordinary range of work, Mr. Reynolds received an extraordinary amount of praise. In countless public and private meetings, his supervisors consistently praised him for serving as an "excellent" Executive Director. This praise can be found in countless YouTube videos hosted on the City's social media pages. Until Mr. Reynolds decided to file a complaint about Wilson's behavior, these evaluations never wavered in their positive nature.

164.     For example, during an April 21, 2022 public meeting, just days prior to Mr. Reynolds's suspension, PAB Board member Nickoloff asked members of the public to

"celebrate" Mr. Reynolds's "leadership" given the "amazing" work to perform the "miracle" of getting PAB up and running with "no staff, no money, and no onboarding process, [and] very little support from the [City] administration."

165.     On May 5, 2022, the day Mr. Reynolds formally filed his complaint, PAB Board member Arlene Brown texted him: "You are doing a good job. Things are going to work out for the good. You are giving it your all. It's going to pay off."

166.     In terms of formal assessments of his work at PAB, the agency's Board never gave Mr. Reynolds an even marginally critical performance review, let alone a negative one. Moreover, until Mr. Reynolds informed Wilson of his intent to complain about her work on April 19, 2022, he had never been the subject of a Human Resources complaint, a Division of Human Rights complaint, or any other formal disciplinary inquiry or action.

167.     As Defendants stated in November 2022, "Wilson admits that he threatened to bring forward a complaint against her *before* staff complaints" were filed against Mr. Reynolds (emphasis added).

168.     The single formal evaluation of Mr. Reynolds's work at the PAB, conducted in 2021, confirmed the widespread belief he was an excellent worker. In the majority of the 14 areas of evaluation, the PAB Board concluded he was an "Outstanding/Role Model" employee. In all other areas evaluated, Mr. Reynolds was rated as "Very Competent." The evaluation's "overall" assessment of Mr. Reynolds's work labeled him as "Outstanding/Role Model," concluding he was "doing a great job."

169.     Mr. Reynolds also received broad support from his own employees and community leaders involved in the PAB's work. Members of the Police Accountability Board

Alliance, the coalition of community activists and organizations responsible for supporting the PAB's work, consistently and praised Mr. Reynolds's "heroic" work as Executive Director.

170.    Unsurprisingly, Mr. Reynolds's suspension from the PAB caused the agency to spiral into dysfunction, face widespread criticism, and lose the majority of its workers.

## IV.    MR. REYNOLDS COMPLAINS – AND IS PUNISHED FOR DOING SO

### A.    Wilson Tells Mr. Reynolds He Will Be "Hurt" If He Engages in Protected Activity

171.    On April 19, 2022, Mr. Reynolds decided neither he nor the PAB could continue to endure Wilson's abuse. At a work meeting held at 240 East Main Street that day, Wilson publicly berated Mr. Reynolds by yelling in his face, calling him an "idiot," and accusing him of not "respecting" her as a "friend." Wilson told Mr. Reynolds that she was angry with him for having "played with her feelings" by refusing to "be with" her.

172.    Mr. Reynolds asked Wilson to "stop telling me about your feelings" and "asking me out." Wilson told him what she often told those who complained about her behavior: that she would only "deal with the problem" if he agreed to "speak to a mediator." When Mr. Reynolds said sexual harassment wasn't something to mediate, Wilson replied, "Then I'm not going to talk with you about anything, including work. I'm fucking done with you." Mr. Reynolds told Wilson that the only thing left to do was for him to "tell the [PAB] Board" about Wilson's sexual harassment. Wilson then replied, in a phrase recorded in Mr. Reynolds's meeting notes: "I'm going to hurt you because you hurt me."

173.    Wilson then suggested that she would consider resigning. Given this offer to avoid the humiliation and risk inherent in filing a sexual harassment complaint, Mr. Reynolds told Wilson that he would not file a complaint until they had a chance to talk again. Wilson agreed to meet that weekend, then left. On April 23, 2022, the day of the meeting to discuss

Wilson's resignation, she called him to ask to postpone the discussion for another week. Mr. Reynolds agreed.

**B.** **Wilson Solicits "Concerns" About Mr. Reynolds that City Officials Call "A Bunch of Nuts"**

174. On April 27, 2022, Wilson's friend on Mr. Reynolds's staff — Maye — convened a meeting for a small group of PAB employees, including Defendants Bascoe and Campbell. One employee in attendance would later say that the purpose of this meeting was to solicit complaints about Mr. Reynolds. This meeting came just four days after Wilson asked Mr. Reynolds to hold off complaining about him.

175. The next day, on April 28, 2022, Wilson convened a work meeting at the home of PAB Board member Setel. One hour before the meeting, Wilson called Mr. Reynolds to inform him that he should not attend what she called a "social get-together" for PAB Board members.

176. As a PAB Board member in attendance would later tell Mr. Reynolds, Wilson spent the April 28, 2022 meeting trying to convince other PAB Board members — for the first time — that Mr. Reynolds was having "serious performance issues" that needed to be "addressed immediately."

177. Shortly thereafter – according to Larry Knox, who succeeded Wilson as PAB Chair – Wilson "put together a special committee" of Board members to "deal with" Mr. Reynolds. This committee included: (1) Wilson; (2) Setel, her closest friend on the PAB Board; and (3) Board member Brown, who would go on to openly deny Mr. Reynolds's claims. In selecting these individuals, Wilson ensured membership of this committee would be supportive of her – and hostile to Mr. Reynolds.

178. Then, on April 29, 2022, Campbell sent Mr. Reynolds an email titled "Senior Staff Concerns." Campbell's email listed "a number of issues related to leadership" that had

arisen "over the last few weeks," and suggested – incorrectly – that the issues were shared by all supervisors at PAB. Those issues, described vaguely, were primarily about "internal communication," "information sharing," "understanding regarding our roles," "hiring and personnel decisions," and Mr. Reynolds's "communication style."

179.    This email was the first time that Mr. Reynolds had heard about any of these issues. There were no concerns listed about sexual discrimination, racial discrimination, or any other kind of actionable wrongdoing. The email asked Mr. Reynolds to "advise on any opportunity to meet with this group for further discussion and resolution."

180.    After receiving this email, Mr. Reynolds met briefly on Zoom with Campbell to talk about her email. Campbell said the issues were "not an emergency," and advised Mr. Reynolds to "wait" to discuss the issues with the staff until one person who was on vacation could return to the office a week later. Mr. Reynolds then ended the meeting.

181.    Minutes later, Mr. Reynolds received a phone call from PAB Board member Bob Harrison. Board member Harrison asked Mr. Reynolds, "What the hell is going on?" Harrison then said that he had received an email from Wilson asking the PAB Board to hold an "emergency meeting" to discuss Mr. Reynolds's "performance issues."

182.    On May 1, 2022, Mr. Reynolds told his assistant, Rina Pacheco-Walker, that he had been sexually harassed by Wilson and that he believed that the "concerns" being raised about his performance were efforts driven by Wilson to spark his termination. Pacheco-Walker disclosed that Defendant Campbell was widely perceived in the office to be a close friend of Maye, which was troubling because Defendant Campbell had been tasked to handle the investigation into the complaints about Maye.

183.    Unsurprisingly – and as Defendants later admitted – Campbell "failed to adequately investigate" complaints against Maye. Campbell failed to ask "key questions regarding allegations," "did not spend more than 20 minutes on a single interview," and led to a final report that exonerated Maye yet "included conclusions that were unsubstantiated by witness testimony and that appeared to include her personal opinions without supporting evidence." Defendants ultimately concluded that Campbell "should not be given discretion to act independently regarding the handling of internal complaints."

184.    On May 2, 2022, two of Wilson's "best friends" — PAB Board members Nickoloff and Setel — arrived unannounced at Mr. Reynolds's office. They then ordered Mr. Reynolds to stop "talking" about his skepticism regarding the "concerns" raised about him. Later that day, Setel sent an email instructing Mr. Reynolds to not discuss any "personnel issues" with PAB Board members until May 9, 2022.

185.    On May 5, 2022, Wilson convened a secret videoconference to have Maye and a handful of other employees present the "concerns" they had raised about Mr. Reynolds a week earlier.

186.    Many PAB Board members openly stated that the "concerns" were, at worst, of minimal importance. For example, in a phone call placed to Mr. Reynolds later that evening, Board member Brown told him that "everything was going to be okay" because "the 'staff concerns' were a bunch of nuts." On a separate phone call recorded days later, Brown would say the "concerns" merited nothing more than a response of "So what?"

187.    Other PAB Board members believed the presentation of "concerns" was a baseless attempt to punish Mr. Reynolds. For example, in a message Defendants admit was written during the May 5, 2022 meeting, Board member Harrison expressed his belief that the

presentation of "concerns" proved that Mr. Reynolds was being subjected to a "viper's den" work environment.

###    C.    Mr. Reynolds Files A Complaint – And Is Told He Will Be "Choked" and "Lynched"

188.    Upon learning that Wilson was convening a secret meeting of the PAB Board, Mr. Reynolds asked another Board member to allow him to speak to the Board at that meeting to explain what was going on. Mr. Reynolds was granted "ten minutes" to talk.

189.    After talking with his leadership coach, therapist, and family members about how best to simultaneously address the misconduct of Wilson, Maye, and Campbell, Mr. Reynolds decided to write out a statement he would recite to Board members at the meeting. As he told his therapist, Mr. Reynolds believed that he could place his faith in the Board to do the right thing.

190.    Late on the evening of May 5, 2022, Mr. Reynolds was allowed into the videoconference — though his leadership coach, Kevin Beckford, could not enter the meeting thanks to intervention by Wilson.

191.    Mr. Reynolds acknowledged the "concerns" raised about employees "get[ting] siloed" and explained he was developing a plan to address those concerns. He then stated his belief that the "root cause" of the concerns was an attempt by Wilson and Maye to "destro[y]" himself and the agency. When Mr. Reynolds began relating the harassment he had experienced at the hands of Maye, Wilson made a "cut him off" gesture. As Defendants have admitted, one of Wilson's friends then muted his microphone, saying, "We don't need to hear about that." Although Board members eventually voted to allow Mr. Reynolds to speak, he was instructed to "keep it brief."

192.    With tears running down his face, Mr. Reynolds summarized the sexual harassment Wilson had put him through, how it had affected him, and why he believed the

"concerns" being raised against him were an effort to silence and retaliate against him. At the end of the statement, Mr. Reynolds said: "I do not want this to become public. I don't want to file a lawsuit against the City. I don't want to tell my staff about this. I just want this to end. We are about to hire a clerk that will report to the Chair of the Board. If that person suffers what I have been going through, I can and should be held responsible. I will not let that happen. This needs to change."

193. When Mr. Reynolds finished speaking, the response from many of the Board members was silence. Setel, visibly angry, broke the silence by telling Mr. Reynolds to leave the meeting.

194. Immediately following the meeting, PAB Board member Brown called Mr. Reynolds. On the brief call, she said: "The 'staff concerns' were a bunch of nuts. Nothing to worry about. Now, what you said about Shani – I wish you hadn't said that."

195. Realizing the PAB Board likely did not believe his story, Mr. Reynolds became extremely distraught. His sister cradled him on the floor of his office as he began to shake and cry, stating: "They don't believe me."

196. In a phone call recorded on May 8, 2022, Brown confirmed Mr. Reynolds's assertion – and his fears that he would be punished for complaining about Wilson.

197. "I could have cheerfully choked you," Brown said on the call, "and taken you out of your misery when you mentioned the 'Shani thing,' because up until that point nothing was personal, and it was a lot easier for me to help people see things clearly. But once it went to a personal level, it's muddy."

198.     When Mr. Reynolds asked Brown if he had lost the Board's "support" for having "brought up the 'Shani stuff,'" Brown replied:

> Heck yeah! Yuppers. . . . the staff members had concerns, okay? We want to know: is this true? You know? 'I don't like how he talks.' You know, so what? Whatever your concern is, I want something concrete that I can work with. Those were the kinds of comebacks that I would have liked to have had with staff, as far as whatever their concerns are. But then when we got 'Page Two' – because as far as I'm concerned, and I'm not in your position, so I can't tell you how to feel, but I thought that yours and Shani's conversation the night of the dinner and anything that transpired after that was personal. There's two adults having a conversation, an agreement, a disagreement that has nothing to do with Board work. Because, see, I'm all about Board work. But when you open the other can of worms, there's nothing you can do or say that would put you in a better light, you know? You felt – this is what I heard – 'I felt uncomfortable and it's bordering on sexual harassment.' Well, if that's the case, why are you still socializing with this person? This person makes you feel this uncomfortable, and you've got issues with that, it's business only! So the fact that you all still socialized, even when it wasn't Board business, had me say – 'Oh, okay, this is just two friends who saw things differently, had a discussion.' And – but then you just took it to a whole other level, which took anything that I had in mind as far as making sure that things in your arena were polished was difficult.

199.     Defendants told state investigators that Brown "admits to [making] these statements," but that her statements were not evidence of "retaliation" for a patently ludicrous reason – namely, that they were "not communications Brown made in her capacity as a Board member, but rather [as] a close friend."

200.     It was undeniably in her official role that Brown later related her disbelief to all of Mr. Reynolds's employees.  In an audio recording of an all-staff meeting held on June 12, 2022, Brown can be heard stating that Wilson resigned as Chair because of a belief that Mr. Reynolds's "accusations" were "a distraction from the work that has to be done."

201.     These beliefs were reiterated during a phone call recorded on May 9, 2022 between Board member Rickey Harvey and Mr. Reynolds.

202.    Harvey, discussing the previous support Board members Nickoloff and Setel had given Mr. Reynolds, explained that Mr. Reynolds's complaint had caused them to "flip" on him. "Your friends are not your friends. You understand? Yep. Now your friends are not your friends."

203.    "You got some tough days ahead of you," Harvey said, because Nickoloff and Setel were "big mad" at Mr. Reynolds for having complained about Wilson.

204.    Harvey said that City officials' response to Mr. Reynolds's complaint would be "hurtful," "personal stuff" driven by their "love for Shani."

205.    Harvey told Mr. Reynolds he needed "fight" against efforts to punish him. "I won't watch you get lynched," Harvey said.

**D.      Defendants Immediately Leak Mr. Reynolds's Complaint to "Destroy" and Silence Him**

206.    According to the City's sexual harassment policy, Mr. Reynolds's supervisors on the PAB Board and all City employees — including Defendants Wilson, Setel, Nickoloff, Bascoe, and Campbell — had an obligation to "keep reports" like his "confidential," sharing them only with "the Department of Human Resource Management."

207.    Rather that follow this policy — and, in doing so, protect Mr. Reynolds from embarrassment, humiliation, and retaliation — Defendants' immediate response to his complaint was to needlessly disseminate its details to countless individuals who were not within the City's Department of Human Resources.

208.    On May 6, 2022 — less than 24 hours after filing his complaint — City Councilmember Martin met with Mr. Reynolds and his sister at their home.

209.    Martin told Mr. Reynolds that Wilson was "terrified" about Mr. Reynolds's complaint spreading beyond City government, as it would "embarrass" her and "end her political

career." Wilson was prepared to "do anything" to make Mr. Reynolds "stop talking." "Shani cares more about destroying you than she does the PAB," Martin said.

210.     Martin explained to Mr. Reynolds that, in an effort to silence him, Wilson had spent the hours after he filed his complaint disseminating its details to, *inter alia*, Martin, City Councilmember Smith, Maye and Bascoe.

211.     Martin's statement was confirmed by Campbell in a May 2022 email, where she admitted that "Board members" like Wilson also disclosed the details of Mr. Reynolds's complaint to her "on Friday, May 6, 2022."

212.     The "concerns" Wilson previously raised against Mr. Reynolds were plainly insufficient to warrant termination. Indeed, during a secret meeting of PAB Board members held in violation of open meetings laws on May 7, 2022, PAB Board members declined Wilson's proposal to take any disciplinary action against Mr. Reynolds.

213.     As such, Wilson needed other City officials to "pressure" PAB Board members to punish him.

214.     To that end, the purpose of Wilson's disclosures to other City officials, according to Martin, was to make others to "disbelieve" Mr. Reynolds's story, convince them he was a "liar," and encourage them to "support" Wilson in "getting [him] fired."

215.     Wilson's disclosures quickly helped her garner the support of the City's most powerful officials. For example, upon learning the details of Mr. Reynolds's complaint from Wilson, Smith sent a text message on or about the morning of May 6, 2022 to the private cell phones of all other City Councilmembers. The text message said Mr. Reynolds was causing "problems" for the City and urged Councilmembers to "contact" and "support" Wilson.

216.    Shortly after Smith sent this text message, City Councilmembers began to send communications to PAB Board members urging them to suspend Mr. Reynolds — and take no action against Wilson. These communications would eventually culminate in a letter sent to PAB Board members by the City Council President, Miguel Melendez, on or about May 12, 2022, stating his "support" for the "suspension" of Mr. Reynolds while "complaints" against him were investigated.

**E.    To Be "Loyal" to a "Best Friend," City Officials Illegally Order Mr. Reynolds to Be Silent**

217.    After selectively leaking Mr. Reynolds's complaint, Defendants' next goal was to stop Mr. Reynolds from discussing his experiences with other employees who were at risk of what he had warned the PAB's Board about – namely, harassment and retaliation at the hands of Wilson and her allies in City government.

218.    To that end, Defendants issued a range of gag orders in person, *via* telephone, text, letter, and email to Mr. Reynolds, all of which told him to stop speaking with co-workers about his complaint of sexual harassment.

219.    These orders came after Mr. Reynolds shared his complaint with PAB Associate General Counsel A.J. Durwin on May 6, 2022. Mr. Reynolds asked Durwin for legal advice on how to proceed while protecting employees from harassment and retaliation by Defendants. Durwin advised Mr. Reynolds to share his complaint with other senior employees at the PAB, whom Durwin believed were "unaware" of the facts about Wilson's behavior.

220.    In a meeting with Mr. Reynolds immediately thereafter — and in the presence of his assistant, Pacheco-Walker — Campbell told Mr. Reynolds he was "instigating problems" at PAB by talking to others about "personal issues" he was having with Wilson. Campbell then said she was "directing" Mr. Reynolds to not talk about "personal issues like that" in the office.

221.    After the meeting, Campbell — as she admitted in a May 2022 email — "told [Bascoe] to let the staff know they did not have to take [Mr. Reynolds's] calls or meet with [Mr. Reynolds]." Campbell then "sent an email to the PAB Board . . . and asked them to reiterate to [Mr. Reynolds] that he should not be reaching out to staff."

222.    Immediately thereafter, Board member Setel emailed Mr. Reynolds what she called a "direct instruction from the Board" to "have no communication with staff about the concerns that have been raised related to your job performance."

223.    Board member Nickoloff then texted Mr. Reynolds, "Conor, Did you receive [Setel's] email?" Mr. Reynolds responded, "I will not be directed to not discuss the sexual harassment I have experienced." Nickoloff replied, "[Y]ou should report it via the appropriate channels and not your staff or subordinates. . . . I'm not clear why you'd discuss it with anyone except city HR if you don't trust the Board to handle it[.]"

224.    As explained in guidance issued in 2012 by the Buffalo office of the Equal Employment Opportunity Commission, "[D]iscussing one's complaints of sexual harassment with others is protected opposition. An employer who tries to stop an employee from talking with others about alleged discrimination is violating Title VII rights, and the violation is 'flagrant' not trivial. . . . [T]elling [a] woman who complained of harassment that they were not to tell others about the alleged harassment is enough to constitute a harm under Title VII. There does not have to be a separate adverse action."

225.    Believing that Defendants' orders were further proof that Defendants were violating his rights and mishandling his reports of misconduct, Mr. Reynolds immediately filed a complaint with the New York State Division of Human Rights about both Wilson's behavior and the retaliation he was experiencing from Nickoloff, Setel, and others.

41

226.     During the afternoon of May 8, 2022, Setel ordered Mr. Reynolds to attend a meeting with Nickoloff and other Board members a few hours later. Mr. Reynolds consulted with Durwin about the legality of joining a meeting that violated state open meetings law. Durwin advised him that, despite the meeting's illegality, he should attend to not give the City "an excuse to fire you." Mr. Reynolds decided to attend the meeting after Board member Harvey texted him to say that he would be "in trouble" if he failed to attend.

227.     During the meeting, Nickoloff demanded that Mr. Reynolds "apologize" for having "disobeyed the Board's orders" by speaking to staff about his sexual harassment experiences. Mr. Reynolds refused to do so.

228.     In an email sent to Mr. Reynolds shortly thereafter, Nickoloff chastised Mr. Reynolds for having "disseminated" his complaint "to staff." Mr. Reynolds replied that he would "respect your request" to "stop speaking to staff about my experiences of sexual harassment" because of a belief he "would face termination if I failed to do so." "As difficult as it is for me to have staff unaware of sexual harassment and retaliation occurring at the agency," Mr. Reynolds noted, "it would be more painful to have the staff without a leader who is willing to protect them. And so I remain quiet."

229.     In a phone call recorded on May 9, 2022, Board member Harvey called Mr. Reynolds to explain that Nickoloff and Setel had lied about the nature of their orders to remain silent. "I said, 'Matthew, you just said [to Mr. Reynolds], 'You violated the Board. You didn't do what the Board said.' I said, 'The Board ain't said shit. . . . Don't come telling me that because you said something, it was the Board. Because [Setel] said something, it was the Board. Y'all didn't bring that shit to us[.] . . . It was not a violation of the Board. I don't give a damn – if you

told him to look up and stare at the wall, that was not a directive from the Board. If you told him

not to talk, and we didn't tell you tell him that, it was not a directive from the Board.'"

230.    Harvey, explaining why Nickoloff would issue an illegal order against a former

"friend" like Mr. Reynolds, said: "That's a personal friendship that went bad, went sour, and it

may be because of his love for Shani."

231.    In a subsequent recorded phone call with Mr. Reynolds, Nickoloff confirmed

Harvey's belief. When Mr. Reynolds mentioned the instructions to "not talk about the sexual

harassment," Nickoloff explained these orders aimed to ensure "that there wouldn't be any

aspersions cast on anybody." Nickoloff elaborated by saying, "I want to be loyal to people

maybe I shouldn't be loyal to. . . . You know that Shani is one of my best friends."

## V.    DEFENDANTS' RETALIATION ESCALATES VIA SUSPENSION, DEFAMATION AND BASELESS COMPLAINTS

### A.    Fabricated Complaints Are Filed Against Mr. Reynolds

232.    Trying to make the best of a bad situation, Mr. Reynolds spent the days after

filing his complaint focusing on his job as Executive Director. During meetings held between

May 6, 2022 and May 11, 2022, Mr. Reynolds finalized a detailed plan for the agency to start

accepting formal reports of police misconduct on May 18, 2022, implementing a timeline Mr.

Reynolds had circulated to the PAB's Board and City Councilmembers a year prior.

233.    Upon learning the details of this plan, Wilson decided to dramatically accelerate

her efforts to silence Mr. Reynolds, knowing that it would be politically infeasible to punish Mr.

Reynolds or label him as incompetent after the agency publicly achieved a major milestone

under his leadership.

234.    In addition to asking employees to obstruct and not implement Mr. Reynolds's

plan, Wilson directed two other individuals he had complained about — Campbell and Maye —

to file false, baseless, and retaliatory complaints against him, with the aim of securing his suspension.

235.    This cynical maneuver proved that City Councilmember Martin was correct in telling Mr. Reynolds that Wilson "cares more about destroying you than she does the PAB." The PAB's union would later state that the actions of Maye, Campbell, and others in PAB's management were a "deliberate effort to drive this agency into the ground" after Mr. Reynolds's departure.

236.    On May 9, 2022, Campbell – at the direction of at least one superior, including Wilson – sent an email to the head of the City's Human Resources department protesting the PAB Board's decision to not punish Mr. Reynolds. In the email, Campbell stated she was speaking "on behalf of the PAB staff" – a group of over thirty individuals – in her capacity as Director of Staff Support.

237.    Campbell requested that Mr. Reynolds "be placed on a paid administrative leave" and that "an independent entity [ ] review and investigate the matter." Campbell said all of Mr. Reynolds's employees were making this request "due to their heightened sense of anxiety, apprehension in coming to work, and fear of retaliation" – and their belief that Mr. Reynolds had created a "hostile, toxic, and retaliatory" workplace for all.

238.    Campbell sent the email knowing that the statements it contained were false, as Defendants admitted one month later.

239.    On or about June 10, 2022, Mr. Reynolds's employees sent a letter to City officials castigating Campbell and others for "submitting statements, public or otherwise, that speak on behalf of [the] Staff[']s collective experience," as the "claims that Conor Dwyer

Reynolds fostered a toxic, paranoid, and racist work environment aren't beliefs shared by all of the staff."

240.    When responding to this letter during a videoconference recorded on June 13, 2022, Defendant Bascoe asserted that Campbell had "never" taken a "survey to see whether or not . . . we can state that the workplace is toxic or that . . . [employees] felt retaliated against." Bascoe also stated "nor can it be seen" that Mr. Reynolds created "a hostile work environment" for employees.

241.    Recognizing that Campbell's email had failed to result in Mr. Reynolds's suspension, Maye filed an internal HR complaint against Mr. Reynolds on May 11, 2022.

242.    Maye alleged that, because Mr. Reynolds made a complaint to the PAB Board on May 5, 2022, the PAB's "work environment . . . has become increasingly hostile, disorderly and unsafe as the result." Maye claimed that Mr. Reynolds's May 5, 2022 complaint to the Board was an attempt to "rally support for his characterization of [Maye] as an aggressive, bullying black woman intent on stealing his job." It also alleged that Mr. Reynolds's complaint was improper because its claims about Wilson and Maye were "inflammatory," "laughable," and "dangerous."

243.    Maye's complaint was facially baseless and retaliatory – and was widely perceived as such by a range of City officials and employees, including the PAB employees who signed the aforementioned June 10, 2022 letter.

244.    Disbelief in Maye's complaint was especially high in Maye's former work environment, the City's Law Department. In the weeks before Maye's complaint was filed, Linda Kingsley – the City's Corporation Counsel – asserted that Maye exhibited behavior so

45

inappropriate that she couldn't be trusted, to the point where the City had previously been forced to "terminate" Maye from City employment.

245.    And after Maye's complaint was filed, employees in the City's Law Department expressed disbelief in her claims, resulting in a statement by one City attorney on December 17, 2022 that Maye's complaint was mere "hyperbole."

246.    Maye's May 11, 2022 complaint was part of a longstanding pattern of subjecting those who complained about her misconduct to baseless counter-complaints. By the end of her tenure at PAB in early 2023, Maye filed such counter-complaints against at least three City officials, including: (i) Corporation Counsel Kingsley; (ii) PAB's Deputy Chief of Investigations Will Cleveland; and (iii) PAB Staff Attorney Erin Barry. Maye even went as far as to threaten Kingsley with a defamation lawsuit.

247.    On November 16, 2022, the City itself concluded Maye's complaint against Mr. Reynolds was "unsubstantiated."

### B.    Mr. Reynolds Is Suspended For No Stated Reason Whatsoever

248.    Unaware of Defendants' efforts to file baseless complaints against him, Mr. Reynolds continued his efforts to open the PAB's doors for accepting complaints of police misconduct.

249.    On May 12, 2022 – one week after filing his complaint with the PAB Board – he sent a letter to the Rochester Police Department stating that PAB would be accepting complaints "in the coming days." His staff closed out the day with a plan to inform the Board, City Council, and community activists about the imminent report-acceptance process.

250.    As Mr. Reynolds was about to leave work that day, he received a phone call from Board member Nickoloff. In recorded audio of the phone call, Mr. Reynolds explained to

Nickoloff that, "Telling people you care about that you're being sexually harassed and having no one believe you is probably the most hurtful betrayal you could imagine. . . . I hope that you recognize that and think about it because it has been horrifying." Nickoloff replied by saying, *inter alia*, "You're experiencing a lot of suffering and I know that I've probably contributed to it through my own kind of imperfection and I do want to apologize for that."

251.    Nickoloff concluded the call by informing Mr. Reynolds that Board members would be attending a long-scheduled "training session" with consultants that evening.

252.    Shortly after the call, Mr. Reynolds received a phone call from the employee responsible for scheduling the session. The employee, confused, said that Board members had failed to show up to the meeting.

253.    Mr. Reynolds drove from the PAB offices to his home. Mr. Reynolds left his personal computer, his briefcase, his personal belongings, and his work notes in the office. Before leaving, he left some notes of encouragement on a few employee's desks, with some articles to read and discuss the following morning.

254.    What Mr. Reynolds did not know is that, rather than attending a "training session," Board members were attending a meeting so hastily scheduled that it violated both state open meetings laws and the PAB's own transparency policies. No member of the public was notified about the meeting in advance. No minutes were taken to record what happened in the meeting. And the Board gave no justification for why, shortly after entering the meeting, they were entering an "executive session" to discuss a "personnel matter."

255.    At 8:30 PM that evening, about two hours after this Board's meeting began, a City security team appeared at Mr. Reynolds's door.

256.    A City security official handed Mr. Reynolds a letter from City Council's Chief of Staff, Smith. The letter stated: "City Council has been informed that the Rochester Police Accountability Board (PAB) has voted to place you on Administrative Leave (suspension). This letter is to inform you that the PAB's action means that, effective immediately, you are hereby suspended with pay pending an administrative investigation."

257.    The letter did not state why Mr. Reynolds was suspended, what the scope of the investigation was, or how long the investigation was expected to last.

258.    After handing Mr. Reynolds the letter, the City's security team sat outside of Mr. Reynolds's home for at least 30 minutes.

259.    When Mr. Reynolds asked to have his personal belongings returned, he was told that they would be available "in a box" at the front of City Hall.

260.    When Mr. Reynolds arrived to pick up the box, a City security team emerged from cars near the entrance to City Hall and followed Mr. Reynolds in and out of the building.

261.    Upon arriving at his car, Mr. Reynolds discovered a bag of rotting vegetables had been placed the bottom of a box containing his belongings.

262.    In a telephone call recorded on May 16, 2022, Mr. Reynolds spoke with the point of contact named in the suspension letter, Smith.

263.    When Mr. Reynolds asked if he would be "told what this investigation is about" and if "anyone knew" why he had been suspended, Smith replied, "I don't think it's been defined."

C.    **Defendants Expand Gag Order on Mr. Reynolds – And Punish Employees Seen As Supporting Him**

264.    One of Defendants' goals in suspending Mr. Reynolds was to prevent him from speaking with his co-workers about both his own complaint of harassment and his fear that other

employees would be subjected to abuse and misconduct at the hands of City officials like Wilson.

265.    This goal was reflected in an unusual directive placed in Mr. Reynolds's suspension letter: "You are not to contact your supervisor, subordinates or co-workers." As revealed by the text of suspension letters issued to other PAB employees during 2022, this directive was not a standard term of suspensions of City employees.

266.    The goal was also reflected during a May 13, 2022 "all staff meeting" held by Board member Setel for Mr. Reynolds's employees.

267.    Before the meeting, Mr. Reynolds received communications from his employees expressing panic and fear about the meeting and his absence in the office.

268.    During the meeting, Setel informed employees that Mr. Reynolds was suspended and that, while he was suspended, they were ordered to have no contact with him.

269.    As one employee wrote on July 30, 2022, "The way that they are so willingly tr[ying] to scare people into keeping quiet is shocking."

270.    Mr. Reynolds's employees were also told to report any contact they believed Mr. Reynolds was having with other PAB employees.

271.    Many of Mr. Reynolds's employees stated that Setel and Wilson's other friends in City government were "obsessed" with trying to prevent employees from contacting Mr. Reynolds to speak with him about his suspension and his complaints.  This obsession went to extremes, with one employee texting Mr. Reynolds on October 12, 2022: "We were just told they are doing a criminal investigation into staff who have been in contact with you."

272.    PAB employees believed they would face adverse employment actions if they violated these orders or otherwise acted to support Mr. Reynolds or complain about his treatment.

273.    This belief was founded on statements made by Defendants during an all-staff meeting held on June 13, 2022, just days after Mr. Reynolds went public with his story of harassment and retaliation.

274.    In an audio recording of the call, Bascoe can be heard urging employees to only "make [complaints] to HR" rather than "complaining to other coworkers" like Mr. Reynolds, saying it "does you no good to complaint to someone who can't help you."

275.    Banks can also be heard instructing employees to "get your issues resolved at the staff level internally first, before escalating it" as Mr. Reynolds did. In response, one employee stated that "the staff do not feel safe" filing complaints about misconduct.

276.    Most notably, Maye can be heard warning that only "legitimate complaints of retaliation or fear should be reported," and that – if an employee filed a complaint Defendants deemed "frivolous" (as Mr. Reynolds's had) – there would be "serious consequences" (as Mr. Reynolds suffered).

277.    Defendants made good on the above threats throughout 2022, subjecting those seen as supportive of Mr. Reynolds to what employees called a "pattern of unjust retaliation and disciplinary actions" that was "the same kind of shit they pulled with Conor."  Such employees include, but are not limited to:

     i.    A young female employee serving in an administrative role who, after filing a complaint of sexual harassment against Banks in May 2022, was stripped of her job duties, given "nothing to do," forced to report to Banks, and subject to work conditions so hostile they amounted to a constructive termination.

50

ii. Árpád Szentkirályi, an operations staffer, who in June 2022 was terminated without any stated reason one week after raising employee complaints during a meeting with PAB Board members.

iii. Mark Prins, a case manager, who – after submitting a complaint in August 2022 "about the current environment and the prevalent feeling of hostility and retaliation that has consumed the office" to the PAB's Board – was punished and fired for what the City said was "discuss[ing] in a public setting for others to hear your HR concerns."

iv. Michael Higgins, the agency's Chief of Policy & Oversight, who in October 2022 filed a whistleblower complaint stating that "Bascoe was intoxicated by drugs or alcohol at a staff meeting." The City responded by immediately suspending Higgins without a stated reason, taking "no action to investigate" his complaint, and "permitting Mr. Bascoe to fire [him] in what board member Reverend Matthew Nickoloff wrote in a text message was 'a clear act of spite and stupidity.'"

v. Brandy Cooper, an investigator, who was – in Defendant's words – "terminated … due to [her] insubordination" at the very moment she was making a public statement on November 9, 2022 denouncing the treatment of PAB employees.

vi. A.J. Durwin, a senior attorney, who was denied the opportunity for a promotion at Wilson's directive because he had encouraged Mr. Reynolds to inform other employees about Wilson's misconduct.

vii. A PAB employee who complained to PAB Board members about the "extremely problematic" leak of Mr. Reynolds's personnel file described *infra* – and who called for "severe consequences for whoever did [the] leak" – was subject to baseless complaints shortly thereafter.

278. PAB employees widely believed they were being targeted for punishment because, as one said in a text message to Mr. Reynolds, Defendants saw employees resisting misconduct and "think it's all you."

279.     Defendants confirmed this belief in an October 12, 2022 press release, which explained that "all personnel decisions made to date" were "necessary steps" taken to address "people who were not aligned with the agency's goals" – namely, the "current and former PAB staff" engaging in "collusion" by communicating with Mr. Reynolds. Defendants stated these actions were part of a plan "vetted by the City's Human Resources and Law Departments."

280.     Defendants' treatment of employees seen as supportive of Mr. Reynolds stands in stark contrast to the treatment of the handful of employees who had been asked to solicit concerns about his work.

281.     Defendants gave these employees sudden, unjustified promotions and raises. For example, days after raising "concerns" about Mr. Reynolds, Bascoe was promoted from a mid-level managerial position to the PAB's head administrator – with a corresponding raise of over $10,000. Banks was also given a raise, making her the highest-paid employee at the agency, earning more than Mr. Reynolds did as Executive Director. Maye was promoted to serve as acting head of the agency's policy division.

282.     Defendants allowed these employees to go on extended vacations, work almost exclusively from home, and otherwise ignore policies that were strictly enforced against other employees. For example, Bascoe was permitted to get paid while vacationing while other employees had their vacation requests ignored.

283.     Defendants ignored countless complaints filed against them – and actively defended them against charges of shockingly severe misconduct, as described *infra*. These employees, as PAB employee Brandy Cooper said in a public statement, were given "the ability to do what [they] wanted to do … with no pushback."

284.     In doing all this, Defendants' message to PAB employees was clear: oppose Mr. Reynolds and be rewarded; support him and be punished. As one employee wrote to Mr. Reynolds on August 31, 2022, "It's so blatantly obvious what they are doing they aren't even trying to cover anything up."

285.     At the same time Defendants worked inside City government to undermine Mr. Reynolds, Defendants moved to isolate him from his greatest supporters in the community: Rochesterians within the Police Accountability Board Alliance.

286.     Stunned by Mr. Reynolds's abrupt and unexplained suspension, many Alliance members clamored for an opportunity to speak to Mr. Reynolds.

287.     Wilson, directly and through messages conveyed by friends, told Alliance members throughout summer 2022 that the City did not want them to Mr. Reynolds or speak with him for any reason.

288.     As one Alliance member later told their colleagues, "We know that [] when [Shani] heard that Conor was coming [to an Alliance meeting], she reached out to people. … [S]he reached out to people on this Alliance."

**D.     The Campaign to Destroy Mr. Reynolds Goes Public**

289.     On the morning of May 13, 2022, hours after suspending Mr. Reynolds, the City issued a brief press release announcing his suspension to the public.

290.     The press release outrageously referred to Mr. Reynolds's suspension a "transition," which conveyed to the public that – regardless of what the facts were – Mr. Reynolds would eventually be terminated.

291.    Through this implication – and by failing to give any explanation for his suspension – the press release communicated to the public that Mr. Reynolds had engaged in the kind of extreme misconduct that would justify an immediate suspension.

292.    The press release did not inform the public that, one week earlier, Mr. Reynolds had filed a complaint of sexual harassment against the PAB's Chair.

293.    Foreseeably – and as intended by the individuals who drafted the press release, including Wilson – the press release caused Rochesterians to assume the worst of Mr. Reynolds, doubt his credibility, and subject him to immense humiliation.

294.    Within hours of the press release being released, Mr. Reynolds was publicly accused of masturbating in the office, embezzling funds, engaging in "sexual harassment," being a pedophile, being a "child molest[er]," "touch[ing] little kids," "touch[ing] some little boys," "being caught with his [penis] out, looking at some [porn]," being a "sexual predator," and committing "sex crimes."

295.    Officials across City government believed that it was wrong and harmful to issue the May 13, 2022, press release.

296.    For example, in a letter sent to PAB Board members on or about May 13, 2022, City Council President Melendez reprimanded them for "mishandling of the communication issued today," as "all staff involved in this matter [must be] afforded their right to privacy and protection."

297.    And in a Facebook Message sent to a friend on May 17, 2022, Board member Nickoloff stated that he was "deeply concerned for [Mr. Reynolds's] safety," given the "harassment" Mr. Reynolds was enduring in the wake of the press release. "I fear too much trauma is already being inflicted," Nickoloff wrote.

E.     **Anticipating That Mr. Reynolds Would Go Public, Defendants Threaten and Preemptively Defame Him**

298.     Days after his suspension, Mr. Reynolds retained counsel to represent him regarding his claims against Defendants.

299.     On May 20, 2022, Mr. Reynolds's attorneys contacted the City to ask for an explanation as to why Mr. Reynolds had been suspended and whether the City was investigating Mr. Reynolds's complaint against Wilson.

300.     Two days later, in an unsolicited text message sent on May 22, 2022, Board member Brown told Mr. Reynolds: "Please proceed with caution. Blowing someone else's candle out will not make yours burn brighter."

301.     Undeterred by this threat, Mr. Reynolds's attorneys contacted a reporter at the *Democrat & Chronicle* on or about May 26, 2022 to discuss Mr. Reynolds's complaint filed with the Division of Human Rights.

302.     Upon learning of this contact, Defendants encouraged Maye to escalate her complaint by re-filing it with the New York State Division of Human Rights, which she did on May 30, 2022.

303.     Defendants' aim in refiling Maye's complaint was to create a false, "dueling complaints" narrative to undermine the public perception of Mr. Reynolds as a victim of harassment and retaliation.

304.     Now expecting Mr. Reynolds's story to become public any day, Wilson began disclosing the details of Mr. Reynolds's complaint to her friends and other community leaders across Rochester in ways that would make them disbelieve Mr. Reynolds's story, convince them he was a liar, and enlist them in the effort to get Mr. Reynolds fired.

305.    To aid in this campaign, Wilson told countless individuals that – in her capacity as a licensed mental health professional – she knew Mr. Reynolds was diagnosed with a loathsome disease: namely, narcissistic personality disorder.

306.    As Defendants admitted in letters sent to the Division of Human Rights on June 8, 2022 and July 11, 2022, Wilson published this statement – by orally stating Mr. Reynolds was a "narcissistic abuser" – to: (1) a fellow mental health professional before and on or about June 8, 2022; (2) attorney Elizabeth A. Cordello on or about June 8, 2022; and (3) local government official Hushla Re before and on or about June 8, 2022.

307.    These statements were false.

308.    Before Wilson made these defamatory statements about Mr. Reynolds, she made identical false claims about other co-workers and friends who complained about her behavior, including: (i) former PAB Board Members Perez and McIntosh; (ii) former City Council President Loretta Scott; and (iii) Wilson's ex-lover, Dr. Biernbaum.

## VI.    MR. REYNOLDS FINALLY GOES PUBLIC – AND GETS SUPPORT FROM OTHER VICTIMS

309.    While Defendants' threats increased Mr. Reynolds's hesitancy to speak out publicly, messages from his employees about Defendants' behavior changed his mind.

310.    In late May 2022, Mr. Reynolds was alerted to the fact that Defendants had taken no substantive action to investigate or address his complaints against Wilson. Wilson was continuing to run PAB Board meetings, give directions to employees, and communicate with City officials about Mr. Reynolds.  Worst of all, Defendants were allowing Wilson to freely interact with and have increased control over his employees – including in closed-door meetings like those during which he had been sexually harassed by Wilson.

311.    The continuing empowerment of Wilson was wrong – as Defendants admitted in November 2022 when they stated "she should have been temporarily removed from the PAB Board while the investigation was pending because of the actual or perceived conflict of interest."

312.    Unwilling to tolerate the obvious risk of harassment Defendants were imposing on his employees, Mr. Reynolds chose to break his silence and inform the public about the widespread and severe misconduct in which City officials were engaged.

313.    On Tuesday, June 7, 2022, Mr. Reynolds published an essay online titled, "I Reported Sexual Harassment by My Boss. A Week Later, I Was Suspended." The essay detailed his experience of harassment, the misconduct he reported to the City, and the retaliation he and his employees were suffering as a result.

314.    Mr. Reynolds's essay made clear that the wrongdoing he and his employees was a matter of public interest, rather than a mere employment dispute. The essay described a "cover-up" and "culture of corruption" aimed at "shield[ing]" powerful City officials like Wilson from "accountability." Mr. Reynolds called on the "community" of Rochester to help "get [City government] back to where we need to be."

315.    Mr. Reynolds's essay prompted victims of Wilson's previous campaigns of defamation, harassment, and retaliation to speak out publicly or reach out to Mr. Reynolds.

316.    Shortly after his essay was published, Mr. Reynolds received a phone call from former PAB Board member McIntosh. McIntosh had resigned from the PAB's Board earlier in 2022 because of bullying, lying, and an effort by Wilson and her friends on the PAB's Board to punish and oust McIntosh for complaining about misconduct.

317. Calling Defendants' response to his complaint "strategic," McIntosh told Mr. Reynolds:

> That game [Wilson] playing is a very dangerous game. She's tarnishing everybody's relationship and reputation. . . . It's literally a game. . . The same knife that cuts the sheep cuts the goat. And that's what she's doing to you because she can't find another person to scapegoat. . . . They're rogue, they're rogue. I'm sorry you have to be enduring that – and the reason I have to say that is because I know. I've been there. . . . It's terrible. I am so sad for what's happening. . . . [Shani] is more worried about tearing people down than the whole fucking mission. Because she's at the helm, she wants to play the victim because she does all this shit behind closed doors. And in the public eye, she acts like she's so great because she's the face of the organization.

318. Mr. Reynolds received a phone call from another former PAB Board member, Perez. Like McIntosh, Perez had resigned from the PAB's Board earlier in 2022, citing bullying, lying, and unethical behavior by Wilson and her friends on the PAB's Board. "It was stuff that would keep me up at night and I didn't feel comfortable with," Perez would later tell the media.

319. Stating that she also witnessed Wilson made inappropriate sexual comments and "lives in a fantasy world," Perez told Mr. Reynolds:

> [Wilson is] gonna deny it all. She's gonna deny it, all of it, because that's what she did to me. And that's what she did to Celia. And now she's doing that with you. . . . I feel that there's some validity to what you're saying because it's very similar to what happened to me and what happened to Celia. Because the minute she doesn't – she thought that you were a threat, or that you were above her, she was gonna get you out. Because that's what happened to Celia. And that's what happened to me when I no longer would stroke her [ego] and I started calling her out for the things she was doing.

320. One Rochesterian replied to Mr. Reynolds's story by posting the following statement online:

> I'm a former patient of Shani's. I believe everything Conor Dwyer Reynolds is saying 100%. I was never sexually harassed by her (at least not like that) but some of the things he quoted her as saying-

she said to me almost word for word. The tactics she employs and
bullying/retaliation he describes I have also experienced first hand.
As one of her PATIENTS.

321.    Another Rochesterian went online to state: "I used to work w her and believe it to
be true as well. I heard she had an affair w another physician at Trillium. Seems to be a trend of
being inappropriate in the workplace."

322.    In a message about Wilson sent to Mr. Reynolds, a former PAB employee wrote:
"I hear she sexually harassed someone at her last job also."  One friend of Wilson's– who had
long been told by Wilson that Mr. Reynolds was "in love" with her – read the essay and realized:
Shani is "delusional."

323.    Another friend of Wilson's contacted Mr. Reynolds to tell him they "believed"
Mr. Reynolds because of Wilson's behavior toward them.

324.    A number of community activists and leaders responded to Mr. Reynolds's essay
by contacting City officials – including Board member Setel – to inform them that Mr.
Reynolds's complaint should be believed because they, too, had been victims of Wilson's
behavior.

325.    In the wake of Mr. Reynolds's essay becoming public, Wilson made a flurry of
emails, texts, and phone calls asking friends and community members to disbelieve, attack, and
lie about Mr. Reynolds. Wilson's requests quickly bore fruit.

326.    Minutes after Mr. Reynolds's essay was posted, Hushla Re – a staffer for New
York State Representative Sarah Clark and "best friend" of Wilson's – tweeted that the essay
was a "story [of] a white man covering his tracks of ineptitude" by "harming" Wilson and
"making her out to be the Black jezebel."

327.    Hushla Re also tweeted that Mr. Reynolds was a "blatant narcissist," an "abuser" making "false allegations," someone making "ridiculous allegations," "retaliating" against Wilson by "coming out with this BS a year [after it happened]," accusing people who believed him of doing Black women "harm by simply taking his word for it."

328.    Another of Wilson's friends, Monroe County Legislator Rachel Barnhart, responded to Mr. Reynolds's essay by smearing him on Twitter as "a paid director of an organization who didn't do much during two years at the helm."

329.    PAB Board member Nickoloff took to social media to promote a post calling Mr. Reynolds's sexual harassment complaint "meaningless vitriol" and asking individuals to "stand by my friend Shani Wilson."

330.    Wilson – knowing Mr. Reynolds's sexual orientation – took an unusually cruel step by attempting to ensure that he would be functionally exiled from the Rochester queer community.

331.    Wilson successfully asked an LGBTQ organization, of which Wilson is a Board member, to make a Facebook post claiming that Wilson was a "victim of attacks on their character" thanks to Mr. Reynolds.  Two other major queer organizations in Rochester supported the post.

332.    Another friend of Wilson's in the Rochester queer community posted on Facebook that Mr. Reynolds was "l[ying] his ass off" and "moved heaven & earth to weaponize systems to punish" Wilson.

333.    A number of Wilson's friends, however, declined her requests to lie about Mr. Reynolds.

334.     For example, when Kevin Beckford was called by Wilson and asked to state a belief that Wilson and Mr. Reynolds had engaged in a consensual relationship, Beckford told Wilson he could not make that statement because it was untrue. Wilson responded by hanging up on Beckford, a longtime friend, and never speaking to him again.

335.     Wilson made the same request to another close friend, who gave the same response Beckford did. Again, Wilson's response was to hang up on the individual and never contact them again.

336.     When Wilson resigned on June 10, 2022 – after days of refusing to do so – she publicly claimed that her resignation from the PAB was "the best thing for this organization." However, Wilson's resignation was not "voluntary" or magnanimous, but rather was driven by City officials – who told her that, if she failed to resign, former co-workers would publicly speak out in support of Mr. Reynolds, testifying to her longstanding pattern of workplace misconduct.In other words, Wilson's resignation was aimed at furthering not the public interest, but her campaign to undermine Mr. Reynolds's claims.

## VII.     DEFENDANTS FURTHER RETALIATE AGAINST MR. REYNOLDS BY DEFAMING HIM AND ILLEGALLY LEAKING HIS PERSONNEL FILE

337.     Defendants' immediate response to Mr. Reynolds's June 7, 2022 essay was to defame him through a statement drafted by attorneys working for the City that would brand Mr. Reynolds a liar.

338.     The statement, made by Wilson, called the contents of Mr. Reynolds's complaint "unequivocally false."

339.     Defendants circulated this statement to members of the media, causing it to be published across New York State and the United States on websites like *Yahoo News*, in

newspapers like the *Democrat & Chronicle,* magazines like *City Newspaper*, on television stations, on social media, and elsewhere in print and on the internet.

340.    Wilson's statement – which conveyed that Mr. Reynolds was, in connection with his profession as a city administrator and attorney, a liar – was false.

341.    Moreover, Defendants knew it was a lie to brand Mr. Reynolds's story as "unequivocally false," as at the very same time they made the statement they were privately admitting that much of Mr. Reynolds's story was true.

342.    In a letter submitted to the Division of Human Rights on June 8, 2022, Defendants stated: "Many of the interactions between Mr. Reynolds and Wilson as alleged in the Complaint did occur[.]" Defendants said Wilson had "admitted to" Mr. Reynolds she had an "attraction to him." Defendants said Wilson told Mr. Reynolds "she was uncomfortable with his interest" in another woman and Defendants agreed that Wilson's behavior required "corrective action."

343.    In addition to drafting and publishing a defamatory statement about Mr. Reynolds, the City's response to his essay was to leak portions of his personnel file to the public.

344.    According to City policy, complaints against City employees are placed into that person's personnel file, which is supposed to be kept confidential. As Banks can be heard telling PAB employees in an audio recording of a meeting held on June 13, 2022, "Those documents shouldn't have been leaked and every person – whether a staff, a person, or a volunteer – has a right to confidentiality and that right was violated."  On the same recording, Setel can be heard admitting that the leak was "shocking" and "disturbing."

345.    As Defendants admitted in a November 29, 2022 letter to the Division of Human Rights, portions of Mr. Reynolds's personnel file were "leaked" to the media on or about June 8, 2022.  As Setel can be heard telling PAB employees in the audio recording of a meeting held on

June 13, 2022, one leaked portion of Mr. Reynolds's personnel file "was made public within 12 hours of its transmission to the [City's] attorney."

346.    While Defendants claim they have "been unable to determine the source of the 'leak,'" the only individuals with access to Mr. Reynolds's personnel file were the City's agents.

347.    The relevant portions of the file were: (i) Maye's May 11, 2022 complaint; and (ii) a statement signed by Board member Setel on June 7, 2022 that claimed that Mr. Reynolds's May 5, 2022 complaint lacked credibility because his "demeanor and affect, at the time of his reading his allegations seemed desperate and hysterical."

348.    As a result of the leak, the contents of Mr. Reynolds's personnel file were published across New York State and the United States on websites like *Yahoo News*, in newspapers like the *Democrat & Chronicle,* magazines like *City Newspaper*, on television stations, on social media, and elsewhere in print and on the internet.

349.    Defendant's release of a defamatory statement and leak of portions of Mr. Reynolds's personnel file to the media had the same foreseeable and intended effect as the May 13, 2022 press release: to make Rochesterians assume the worst of Mr. Reynolds, doubt his credibility, and subject him to immense humiliation.

350.    In the wake of Defendants' statements, members of the public went to social media to call Mr. Reynolds "pathetic," "full of shit," "mentally ill," a "perv," a "terrible liar," a "cry baby," a "joke," an "idiot" who was "selling" a "bogus" narrative, a person "lying through their teeth to save their skin," and someone "looking for a pay day." Some responded by asking Mr. Reynolds if Wilson "asked you for a mustache ride" or if he "fuck[ed] her."

351.    Wilson's friend, Monroe County Legislator Rachel Barnhart, tweeted that the leaked personnel file was proof that Mr. Reynolds made the PAB "a disaster" and was ousted thanks to a "staff revolt."

352.    City officials widely circulated the contents of Mr. Reynolds's leaked personnel file within City government. For example, in a text message sent to fellow City Councilmembers on or about June 8, 2022, Council President Melendez circulated copies of news articles covering the leak to members of City Council, telling them – in sum and substance – that "the hits" against Mr. Reynolds "keep coming."

353.    Despite the punishment Defendants had inflicted on Mr. Reynolds for speaking out on June 7, 2022, he continued to share his story of harassment with community members and urge them to act to protect PAB employees from further harassment and retaliation.

354.    At the same time, whenever PAB employees became the subject of sexual harassment, baseless complaints, pretextual discipline, forced resignations, and unlawful terminations, they often reached out to Mr. Reynolds for help. Mr. Reynolds responded by connecting them with attorneys, journalists, community members, and others who could help them address and oppose the discrimination and retaliation they were facing.

355.    Defendants – including and especially Wilson – responded to these efforts to oppose governmental abuse and misconduct by escalating their efforts to silence Mr. Reynolds.

356.    For example, Ted Forsyth – co-founder of the Police Accountability Board Alliance – told Alliance members on or about July 21, 2022, that he had "hear[d]" from City officials who were denying the truth of Mr. Reynolds's claims. Given what City officials were telling him, Forsyth said the Alliance should "not [be] worrying about Conor" and "not [be] inviting him" to speak with its members. Forsyth petitioned the Alliance to send a letter to Mr.

Reynolds that said its members "don't want to communicate with" him until the City's investigation was completed. Forsyth also petitioned the Alliance to send a "letter of appreciation and thanks" to the City officials who had suspended Mr. Reynolds.

357.     Pamela Kim – one of Wilson's friends who remained in close contact with her throughout Mr. Reynolds's suspension – buttressed Forsyth's request. Kim asked that the Alliance ensure that Mr. Reynolds "not speak" to its members by "put[ting] something in writing." Calling Mr. Reynolds's behavior "strange," Kim said that members of the public could not "rely on him" to tell the truth "while he's suspended." Kim urged Alliance members to question Mr. Reynolds's judgement, stating, "How do we know that Conor doesn't know why he wasn't suspended?"

358.     Shortly thereafter, on August 4, 2022, Mr. Reynolds received a text message from Forsyth chastising him for "talking to everyone about your case."  Forsyth requested that Mr. Reynolds "remain silent."  On Facebook, Forsyth would later post that Mr. Reynolds was peddling "total bs," that he "should be fucking ashamed," and stating, "Thank God Shani got out of this hellhole."

359.     Despite Defendants' efforts, the members of the Alliance voted to "write to the [PAB] Board and insist [Mr. Reynolds] be reinstated."

360.     On August 19, 2022, the Alliance drafted a demand letter that cited the "illegal" nature of Mr. Reynolds's suspension and the "extremely slow speed" of the City's "investigation."

361.     Upon learning of activists' plan to call for Mr. Reynolds's reinstatement, Defendants launched an effort to squelch the statement, resulting in the Alliance dropping its

plan to issue the reinstatement letter. As one person involved wrote, "there was pushback on the letter from her [Shani]."

362. Upon learning that Mr. Reynolds refused to stop speaking with his co-workers, former employees, and community members about Defendants' campaign of harassment and retaliation – and sensing that those protected activities were threatening their grip on the PAB – Defendants chose to double down on their pattern of retaliation-through-defamation.

363. On October 12, 2022 – one day after PAB's union called on the City to terminate Defendant Bascoe for having "stoked and enabled an atmosphere of harassment, intimidation, retaliation, and confusion" within the PAB – Defendants issued a press release titled "PAB Calls for State Investigation Into Former Executive Director."

364. The press release was drafted and published by, *inter alia*, Defendants Bascoe, Nickoloff, Setel and Banks.

365. The press release said that the New York State Attorney General needed to investigate Mr. Reynolds, as he had committed the "crime[s]" of "[c]ollusion and interference with a governmental investigation" by "holding alleged meetings with current and former PAB staff, members of the Police Accountability Board Alliance, and others including a meeting at his home this past weekend with former staff and other parties."

366. This statement, that Mr. Reynolds was engaging in serious crimes of felony obstruction of justice, obstructing governmental administration, and conspiracy, was false – and Defendants knew so or should have known so when they made it.

367. Defendants admitted as much on November 16, 2022 when they informed the public that "[n]o party" – including Mr. Reynolds – had "interfered with, or attempted to influence" the City's "investigation."

368.    Moreover, Defendants know that the actions they "allege" Mr. Reynolds engaged in – namely, speaking with co-workers and community members about opposing discrimination and retaliation – is activity *protected*, rather than prohibited, by the law.

369.    The defamatory statement was published across New York State and the United States on websites like that run by the PAB and *AmericanPoliceOfficersAlliance.com*, on television stations like WHAM 13 News, on social media, and elsewhere in print and on the internet.

370.    The statement continues to be published on the City's websites.

371.    Prior to issuing this statement, Defendant Bascoe had told PAB employees he was so angry with Mr. Reynolds that he wanted to "slap the fuck out of" him.

## VIII.   THROUGH SHAM "INVESTIGATION," DEFENDANTS HUMILIATE AND TERMINATE MR. REYNOLDS

### A.    The City Launches an "Independent Investigation" Overseen By Wilson's Friends And Performed By Attorneys Defending Against Mr. Reynolds's Claims

372.    On or about May 19, 2022, Defendants created a six-member "Select Committee" charged with guiding City Council in overseeing and directing an "investigation" into Mr. Reynolds and any complaints he had made.

373.    The six-member "Select Committee" included: (i) Wilson's "soul mate," City Councilmember Smith; (ii) Wilson's "best friend," PAB Board member Setel; (iii) PAB Board member Brown, who had long expressed anger at, and disbelief in, Mr. Reynolds; (iv) Councilmember LaShay Harris, a longtime associate of Wilson's in the medical field; and (v) Councilmember Gruber, one of the politicians Wilson said Mr. Reynolds needed to be "protected" from.

374.    In tasking these individuals with directing the City's response to Mr. Reynolds's complaints (and any raised about him), Defendants guaranteed that the "investigation" would be little more than a tool to attack Mr. Reynolds's claims and justify his termination.

375.    Defendants further secured this guarantee on May 19, 2022, when the City announced to the public that it would hire the law firm of Constangy, Brooks, Smith & Prophete, LLP ("Constangy") to conduct an "investigation" into "complaints by personnel of the Police Accountability Board."

376.    What Defendants failed to say publicly was that, according to the contract the City signed with Constangy, the firm was also responsible for "provid[ing] legal representation" to the City "in response to" Mr. Reynolds's complaints.

377.    In short, the City hired Constangy to both investigate and defend against Mr. Reynolds's complaints.

378.    Before Constangy had conducted a single interview, Defendants told the public that Mr. Reynolds's claims were "unequivocally false" and told the State Division of Human Rights his claims were baseless and made in "bad faith."

379.    Given these statements, the only way Constangy could perform their competing tasks in their clients' interest was to declare Mr. Reynolds's claims unsubstantiated – which, unsurprisingly, is what Constangy ended up doing.

**B.    City Allows Attorney with Known, Deep "Conflict of Interest" To Perform "Investigation"**

380.    To veil the true nature of the "investigation," Defendants framed Constangy's work as being led by a "third-party independent investigator" – namely, Constangy attorney Taren Greenidge.

381.    In reality, Greenidge was anything but "independent."

382.    At the time Greenidge was hired, it was widely known in Rochester that she was friends with one or more City officials who worked to solicit "concerns" about Mr. Reynolds and file baseless complaints against him.

383.    The most widely known of these friendships was with Defendant Bascoe, who was promoted on May 25, 2022 to serve as an "interim" PAB Executive Director until, at minimum, Greenidge's "investigation" concluded.

384.    The friendship between Bascoe and Greenidge was deep and longstanding. Indeed, in photographs posted across the internet (and available in local publications) at the time of her hiring by the City, Greenidge could be seen socializing with Bascoe.

385.    Bascoe and Greenidge also served together on multiple commissions and panels. See, e.g., https://www.harrisbeach.com/insights/harris-beach-rochester-black-bar-association/; https://www.facebook.com/mcbany/posts/the-mcba-Board-of-trustees-has-taken-this-year-of-pause-to-focus-on-racial-equit/4179287445435610/; https://nydailyrecord.com/2017/10/19/three-bars-join-together-to-raise-important-discussion-at-cle-diversity-inclusion-and-retention/; https://nydailyrecord.com/2015/09/01/on-the-town-rbba-event-supports-minority-internship-endowment/.

386.    The relationship between Greenidge and Bascoe was so strong that, on or about May 2022, Greenidge disclosed this relationship as a "conflict of interest" to City officials via email.

387.    This conflict presented itself in five ways:

    i.  First, Greenidge was tasked with investigating at least one complaint made *against* her friend;

    ii.  Second, Greenidge was tasked with investigating at least one complaint made *by* her friend;

      iii. Third, the longer Greenidge's "investigation" lasted, the longer her friend retained his promotion;

      iv. Fourth, if Greenidge's "investigation" substantiated Mr. Reynolds's harassment and retaliation claims, there was a strong likelihood he would return to work – and, thus, cause her friend to lose his temporary promotion; and

      v. Fifth, if Greendige's "investigation" successfully called for Mr. Reynolds's termination, it was possible her friend would receive a permanent promotion to the PAB Executive Director position.

388.    With knowledge of these issues, Defendants should have done what any reasonable person would do to maintain the integrity of a purportedly "independent" investigation; *i.e.*, remove Greenidge from any role in investigating Mr. Reynolds or the claims he filed.

389.    Instead, the City simply told Greenidge to have "no contact with" Bascoe during the course of her work and have someone else "interview and collect any relevant documentation" from him.

390.    In sum, the City allowed Greenidge to decide the merits of complaints made against her friend, decide the merits of complaints filed by her friend, and decide an "investigation" where her friend stood to benefit from one particular outcome.

391.    Unsurprisingly, Greenidge would end up making all these decisions in Bascoe's favor.

392.    Just as unsurprisingly, on or about May 2022, Bascoe told a group of PAB employees – including Brandy Cooper, Mary Elliott, Karen Mattu, Barry and Colton Kells – that he would "be okay" because Greenidge had been hired to lead the "investigation."

C.      **Defendants Refuse to Promptly Investigate Mr. Reynolds's Complaint**

393.    Under City policy, the City was supposed to conduct an investigation and provide a "preliminary response" to Mr. Reynolds "within 15 working days after the investigation began," with a "final decision" being made "within 30 - 45 working days."

394.    On May 8, 2022, Board member Setel informed Mr. Reynolds, "your sexual harassment claim against Shani is being investigated by the City."

395.    On May 16, 2022, City Council Chief of Staff Smith told Mr. Reynolds that the investigation would take "weeks."

396.    On May 19, 2022, City Council passed legislation requiring the investigation to "be completed in the next 30 days if practical or as soon as possible."

397.    During a public meeting held on May 20, 2022, Council President Melendez stated that the investigation would be a "30 to 45 day endeavor."

398.    Despite these policies and statements, it took the City until November 16, 2022 – that is, over 130 working days and more than six calendar months – to provide Mr. Reynolds with any kind of response into his complaint.

399.    Moreover, it took the City until September 19, 2022 – that is, over 90 working days and more than four calendar months– to even interview Mr. Reynolds about his complaint.

400.    While City policy states that "[e]xtension" of its investigatory "time frames may occur due to the complexity of a *particular complaint*," Defendants did not claim this was true in Mr. Reynolds's case.

401.    Instead, Defendants state Mr. Reynolds was "not interviewed in the initial stage of the investigation" complaint because of their desire to "complete collection of available, relevant information" about *other* complaints examined by Constancy – including complaints that had nothing to do with him. This is no justification for refusing to conduct a prompt investigation.

402.     Defendants cared so little for promptly investigating Mr. Reynolds's complaint that, as PAB Chair Knox explained during an October 6, 2022 Board meeting, he was told that the investigation "didn't have a time frame" for completion.

403.     These delays reflected not only the City's indifference and hostility to Mr. Reynolds's complaints, but also Defendants' efforts to find after-the-fact justifications for his pretextual suspension.

404.     Indeed, in the months after his suspension, Mr. Reynolds repeatedly asked the City *via* phone call and email to provide him with specific notice of the charges or potential grounds for disciplinary action.

405.     For over four months, the City refused to provide Mr. Reynolds with any sense of the charges that justified his suspension.

406.     The purpose of this lengthy silence was simple: the City needed time to hunt for and solicit after-the-fact reasons to fire Mr. Reynolds.

407.     For example, in the weeks after Mr. Reynolds's suspension, members of the "Select Committee" and/or the lawyers they oversaw:

   i.    Entered the office of PAB associate general counsel A.J. Durwin and asked if he had "any complaints" he wished to file against Mr. Reynolds;

   ii.   Combed through the entirety of Mr. Reynolds's emails for possible policy violations that, before his suspension, had never been identified or raised; and

   iii.  Held interviews with Mr. Reynolds's employees where they were asked if they had any "concerns" they wished to raise about Mr. Reynolds.

408.    After four months of searching for pretext, on September 15, 2022, the City sent Mr. Reynolds what it later told the public was a fifteen-item "list of the allegations known to have been made against" him.

409.    In truth, what Mr. Reynolds received was *not* sent a specific list of charges against him, undermining his ability to respond to those allegations. Instead, it was what Defendants called a "general summary of the topics that w[ould] be discussed" during an interview with him scheduled for less than a week later.

410.    This "summary" stated that, beyond his own complaints and those against third parties, the City wanted to interview him about just four broad "topics":

   i.    Maye's May 11, 2022 "complaint;"

   ii.   "Failure to adhere with PAB Charter Section 18-7 regarding required training;"

   iii.  "Disclosure of, without proper authorization, non-public information or records in violation of the City's Code of Ethics;" and

   iv.   "Employee concerns and alleged policy violations including allegations related to: hiring and interview practices, job title/delegation changes, creation of PAB policies that were duplicative and/or inconsistent with City of Rochester established policies, changing of job titles to allow people to retain their positions who had been hired without the proper qualifications or which resulted in employee demotion, allowing or directing employees to work in capacities outside of their established job duties or level."

411.    As the City admits, the fourth "topic" of "[e]mployee concerns" had been presented to the PAB Board on May 5, 2022 and – in a meeting held on May 7, 2022 – been found by the Board to not justify *any* disciplinary action against Mr. Reynolds, let alone his suspension.

412.     The three remaining "topics" were not communicated to the PAB's Board before they voted to suspend Mr. Reynolds on May 12, 2022.

413.     As Defendants admitted in the final "investigation" report written in November 2022, the allegations underlying the "topics" related to training and disclosure of non-public information were discovered *after* Mr. Reynolds's suspension.

414.     And as PAB Board member Setel admitted during a PAB all staff meeting recorded on June 13, 2022, the PAB's Board had "never seen" Maye's May 11, 2022 complaint – meaning that it could not have been a basis for his suspension on May 12, 2022.

**D.     Amid "Investigation," Those Leading It Label Mr. Reynolds's Complaint As False – and Organize Public Support for His Harasser**

415.     In a letter provided to the media on May 13, 2022, City Council President Melendez promised the public that the City would investigate Mr. Reynolds's complaint "with neutrality."

416.     Nevertheless, five months before the City concluded its "investigation" – and months before the City even interviewed Mr. Reynolds regarding his claims – the City issued official and public statements concluding his claims were false. For example:

    i.    On June 7, 2022, the City drafted and publicly disseminated a statement from Wilson calling Mr. Reynolds's complaint "unequivocally false;"

    ii.    On June 8, 2022, the City submitted a statement to the New York Division of Human Rights stating that Mr. Reynolds's complaint both "lacked credibility" and was made in "bad faith;"

    iii.    On June 8, 2022, the City leaked documents to the media calling Mr. Reynolds's complaint "desperate," "hysterical," and "laughable;" and

    iv.    On June 10, 2022, the City drafted and publicly disseminated a second statement from Wilson calling Mr. Reynolds's complaint "false."

417.    Defendants underscored these messages by having those oversee the "investigation" make public calls to support and give money to Mr. Reynolds's harasser.

418.    For example, upon replacing Wilson as PAB Chair in June 2022, PAB Board member Larry Knox issued a lengthy public statement during a Board meeting praising his predecessor, with Board members Brown, Nickoloff, and Setel smiling and nodding along in support.

419.    "I do want to give a thank you and appreciation to our former Board Chair Shani Wilson," Knox said. "She put in a lot of good work for a lot of years to help make this happen, and for the last two years worked, you know, tirelessly every day to get to the success of this Board. And I just want to thank her for her time. I know she's still going to be out there encouraging us. And I just want to really put a thank you in to Shani for the time she put in making sure we keep working [toward] that vision that all of us on this Board, including Shani, want." Shortly thereafter, on or about September 4, 2022, an event was held to garner public and financial support for Wilson as she moved out of Rochester.

420.    This fundraiser was attended by least two of the officials overseeing the "investigation" into Mr. Reynolds and his claims against Wilson, namely, Councilmember Smith and PAB Board member Setel.

421.    In a post made on September 4, 2022 to her Facebook page about the event, Councilmember Smith wrote: "Attending a fund raiser for Shani Wilson and expressing how much I will miss her and her leadership. She is extremely principled and I will miss her dearly!!!"

422.    In photos accompanying the post, Smith can be seen embracing Wilson while Setel sits on a chair at the event.

423.     On or about this time, Councilmember Mary Lupien – who was responsible for helping "implement" any recommendations flowing from the "investigation" – posted on social media both photos of her hugging Wilson and statements of praise for Wilson.

424.     These public statements of support for Wilson, combined with the public statements proclaiming the falsehood of Mr. Reynolds's complaints, communicated that – regardless of what the facts were –Mr. Reynolds was not to be believed.

425.     Even after Mr. Reynolds was terminated, Defendants continued to use government resources to urge support for Wilson. For example, in a public meeting held on January 19, 2023, Nickoloff – after giving "thanks to my family, to my church, to Shani" – stated his "hope that the rest of the community can recognize" that "Shani … drove herself into the ground to make sure" the PAB would be in a "great position."

**E.     City Conducts "Investigation" In Patently Biased, Retaliatory Manner**

426.     Across its six-month span, Defendants took pains to ensure their "investigation" reached the foregone conclusion of justifying Mr. Reynolds's termination and undermining his claims.

427.     Despite purporting to "thoroughly vet" Mr. Reynolds's sexual harassment complaint, Defendants refused to collect or review a wealth of evidence supporting his allegations. For example, except for Wilson's work emails, investigators neither requested nor reviewed the text message and email history of the Board members and other City officials who Mr. Reynolds alleged used these mediums to retaliate against him.

428.     While banning Mr. Reynolds from speaking with co-workers during the investigation, Defendants allowed others subject to the "investigation" – including Wilson, Maye, and Bascoe, all of whom had been accused of retaliatory behavior – to speak with other City officials and employees.

429.     Key individuals – including those whose testimony disproved some of the "substantiated" allegations against Mr. Reynolds – say they were never contacted during the "investigation."

430.     For example, the journalist who requested that Mr. Reynolds send the emails at the center of the improper disclosure allegation – and who understood that PAB Board members had authorized the sending – was never interviewed.

431.     The City's investigators also openly "steered" witness testimony and collection of documents away from substantiating Mr. Reynolds's claims.

432.     For example, the City refused to contact Wilson's prior employers, past co-workers, former PAB Board members, and community activists who would testify that Mr. Reynolds was simply the latest in a long line of Wilson's victims – and that Wilson openly complained about Mr. Reynolds "rejecting" her.

433.     Witnesses interviewed stated that the "investigation" report's key conclusions relied on misattributed and misquoted testimony.  This is an unsurprising fact, given that – in the City's own words – "none of the witness interviews were recorded," meaning there is no way to verify what witnesses actually told the City.

434.     For example, to justify its conclusion that Mr. Reynolds was not sexually harassed, the "investigation" relied heavily on a single individual's testimony that Mr. Reynolds had expressed "mutual interest" in Wilson – despite the individual saying they gave testimony to the exact opposite effect.

435.     Defendants themselves have admitted that the "investigation" contained errors. For example, during a December 1, 2022 public meeting, Setel stated that investigators'

conclusions reflected a "misunderstanding" about Board training – a key subject in the investigation.

**F.**   **"Investigation" Concludes with Transparently Pretextual Call for Mr. Reynolds' Firing**

436.   The City's "investigation" concluded in a report dated November 16, 2022.

437.   The report was split into three parts: one that dealt with Mr. Reynolds's claims against Wilson; one that dealt with "concerns" and "complaints" about Mr. Reynolds; and a final part dealing with claims against other PAB employees.

438.   In all three sections, the investigators contorted themselves to serve their clients' interests and punish Mr. Reynolds.

439.   In the section regarding Mr. Reynolds's claims, the report misstated those claims in ways that allowed Defendants to ignore blatant violations of Mr. Reynolds's rights.

440.   For example, in defining Mr. Reynolds's retaliation complaint, the report states that its analysis was limited to "the only purported adverse employment action that he alleges" – that is, being "placed on leave" in May 2022. Defendants knew this was false.

441.   In the documents and testimony submitted to investigators, Mr. Reynolds had complained about a range of other adverse employment actions listed *supra*, including but not limited to: the leaking of his personnel file; the Board ordering him to not speak about his "harassment experience" with his "staff or subordinates"; and Defendants "incorrectly treating ordinary performance-related concerns … as formal complaints of misconduct."

442.   If the report had analyzed these allegations – for which there is immense documentary evidence in support of Mr. Reynolds's claims – it would have been forced to conclude he had been subject to retaliation.

443.    Despite ignoring much of the evidence proving Mr. Reynolds was harassed by Wilson, the report nevertheless concludes that Wilson engaged in behavior toward Mr. Reynolds that was "not appropriate," "clearly inappropriate, "incredibly inappropriate," and "wholly improper."

444.    This "corroborated" behavior included having "discussions about sexual preferences and history" and "shar[ing] with Dwyer Reynolds that she had romantic feelings for him at his home on November 19, 2020."

445.    This "corroborated" behavior included Wilson telling multiple individuals she "had to act like a dominatrix and Dwyer Reynolds like a submissive which included humiliating him at work."

446.    Finally, the report found that "Dwyer Reynolds' allegation that Wilson pressured him to end a romantic relationship with her friend was corroborated."

447.    Nevertheless, the report concluded – on the sole basis of unidentified witnesses having "attested to the existence of a mutual romantic interest" between Wilson and Mr. Reynolds – that this was not sexual harassment because Wilson's behavior was not "unwelcome or retaliatory."

448.    This statement contorts reality to ignore the obvious: that a boss coercing a subordinate they have "feelings for" into ending a sexual relationship with another person is, by definition, "unwelcome" – and is thus sexual harassment.

449.    As City Councilmember Martin told a group of community members the night the report was released, the report's conclusion flew in the face of its on factual findings, which showed that Mr. Reynolds had been sexually harassed.

450.     In the section dealing with "concerns" and "complaints" about Mr. Reynolds, the report found that every allegation made before his suspension – allegations that constituted every claim of substantial misconduct, like discrimination and retaliation – was "unsubstantiated."

451.     Despite clearing Mr. Reynolds of both all serious misconduct and all misconduct that could have theoretically justified his suspension, the report called for Mr. Reynolds to be terminated on the basis of four trivial activities: (1) accepting, after his suspension, the City's return of a computer used at work that contained City files and making a back-up of files he believed revealed official misconduct by senior City officials; (2) sharing six emails requested by reporters in early 2021 at the direction of his bosses; (3) not attending training sessions on police oversight he organized and scheduled for his new employees; and (4) allowing a recent law graduate to, in line with common procedure in the legal profession, study for the bar exam when not tasked with other work.

452.     These four activities all involved activities that in fact do not violate City policy, were authorized by City officials, were so widespread as to receive such authorization implicitly, or involved harmless errors that no City official would ever be reprimanded for.

453.     To deny this truth – and create a pretextual basis for terminating Mr. Reynolds – the report again engaged in remarkable contortions.

454.     For example, in declaring Mr. Reynolds's sharing of emails with reporters was done in "blatant disregard of the City's Code of Ethics Section 7," the report relies on a non-existent version of the provision – and, as such, materially misstates the relevant rule.

455.     According to the report, the violated provision "expressly states, 'No City officer or employee may disclose non-public information or records concerning ny [sic] aspect of the

government of the City, nor may he use such information to the advantage or benefit of himself or any other person.'"

456.    The actual text of Section 7 as it appears in the current Code of Ethics reads: "No City officer or employee shall disclose *without proper authorization* nonpublic information or records concerning any aspect of the government of the City, nor shall be or she use such information to the advantage or benefit of himself or herself or any other person." See City Charter Section 2-18(C)(7) (emphasis added).

457.    In misreading the rule, investigators were able to ignore the crux of Mr. Reynolds's defense: that he only shared materials pursuant to authorization from his supervisors on the Board.

458.    A similar misreading supported the report's conclusion that Mr. Reynolds actionably disregarded the City Charter's training requirements for PAB staff by performing work at the behest of City Council instead of attending a series of training sessions he created for his employees in spring 2022.

459.    According to the report, Mr. Reynolds "violat[ed] the PAB Charter requirements that all staff attend annual training" on a list of fifteen enumerated subjects. In truth, the Charter's training requirements – found at Section 18-7 – merely requires that staff engage in "ongoing training" in the enumerated areas. As Mr. Reynolds told investigators, he had already been trained in many of the areas, helped develop the training programs in others, and was planning on receiving further training in other areas. Even if the Charter had required "annual" training in all enumerated areas, it was only May when Mr. Reynolds was suspended – meaning he had seven more months to complete the training without violating any Charter provision.In recognition that the "substantiated" claims could not merit discipline on their own, the report

relied on hyperbole, character attacks, and patently frivolous grounds to justify Mr. Reynolds's suspension.

460.    For example, the report called for Mr. Reynolds to be terminated not only because of these "substantiated" allegations, but because he "defend[ed] his actions" – a defense made at the request of investigators, who explicitly asked him to explain his actions.

461.    In the final portion of the report, dedicated to dealing with claims against Bascoe, Maye, and other PAB employees, the report frames these individuals as "Witnesses," rather than subjects.

462.    In assessing the claims against these "Witnesses," the report often finds that inappropriate behavior occurred, yet refuses to conclude that any policies were violated (or that any disciplinary action need be taken). To reach these conclusions – the benefit of which inure to at least one friend of the lead investigator, Greenidge – the report again uses twisted logic.

463.    For example, after finding that Maye engaged in bullying behavior, the report concluded that no discipline was necessary because "there is no policy that covers bullying or toxic work environment claims." As the PAB union publicly noted after the report's release, this conclusion ignores the existence of the City's Workplace Violence policy, which explicitly prohibits "bullying."

464.    In sum, the warped logic of these conclusions reflected the biases and overtly improper aims of the "investigation" which generated the report itself.

### G.    Defendants Violate Mr. Reynolds's Rights By Publicly Releasing the "Investigation" Report

465.    In a brief filed in New York state court on June 16, 2022, City Corporation Counsel Linda Kingsley defended – at length – the City's longstanding policy banning the public

release of "unsubstantiated allegations" made against not only "police officers," but all municipal employees "[g]enerally."

466.    As Kingsley explained to the court, "disclosure of records related to unsubstantiated complaints would constitute an unwarranted invasion of privacy."

467.    Just months later, however, Defendants would – through publication of the Constangy report – publicly disclose nearly a dozen unsubstantiated allegations against Mr. Reynolds, along with underlying assertions the City found to be baseless.

468.    Specifically, as PAB Board Chair Knox explained in a public meeting held on October 20, 2022, Defendants allowed the "[Select] Committee" – comprised of Wilson's friends – to determine what facts and information from the investigation "don't need to be [made] public" given "concerns" about Mr. Reynolds's "privacy."

469.    Defendants cannot claim this massive, unprecedented violation of the City's non-disclosure policies was accidental or immaterial.

470.    Indeed, through its investigative "report," Defendants asserted that releasing "nonpublic" information, regardless of the justification for doing so, is enough to constitute an actionable violation of the City's ethics code.

471.    Moreover, of the many then-current City employees who had unsubstantiated allegations against them listed in the report – including, for example, Bascoe – Mr. Reynolds was the only one whose name was not redacted or anonymized to, in the report's words, "protect [their] confidentiality."

472.    This differential treatment of Mr. Reynolds, combined with the City's longstanding knowledge of and opposition to the damages imposed by disclosure of

unsubstantiated allegations, make clear that the City's aim in publishing the report was to harm Mr. Reynolds.

473.     Likewise, by releasing the details of its investigation into Mr. Reynolds's own claims of sexual harassment, the City knowingly published the lurid details about the heinous treatment he suffered – a humiliation that any reasonable employer would know justifies keeping the details of any complaint of sexual harassment confidential, even those found to be "unsubstantiated."

474.     In redacting countless pages of the report that discuss Mr. Reynolds's complaint – and releasing the "redacted" report publicly while disseminating the "unredacted" report within City government – Defendants again furthered their goal of discrediting and embarrassing Mr. Reynolds.

475.     By redacting the most troubling portions of Mr. Reynolds's allegations (and supporting evidence), Defendants sought to publicly downplay the allegations he had made. As Board member Nickoloff noted in a public meeting held on November 3, 2022, if the report were to "take things" said by witnesses like Mr. Reynolds "out of context without permission," it "not only hurts the perception of what's going on but also hurt the trust in the agency."

476.     By circulating the most intimate portions of Mr. Reynolds's allegations (and supporting evidence) within City government, Defendants sought to embarrass Mr. Reynolds by disseminating his private medical information and sexual history to a wide range of City officials outside the Department of Human Resources.

477.     In sum, the mere release of the report – as much as its contents – served to make the "investigation" a tool of humiliation and punishment.

**H.     Defendants Mislead the Public About the Investigation's Conclusions – And Again Defame Mr. Reynolds**

478.     Knowing that the report's findings failed to justify terminating Mr. Reynolds, Defendants openly lied to the public about its contents and nature.

479.     For example, in a post made on Facebook on November 16, 2022, Banks – the PAB's Chief of Public Affairs, whose job was to issue statements on behalf of the agency – issued a statement on behalf of "we," the PAB, along with a link to the City's "report."

480.     In the statement, Banks said: "This investigation has revealed Conor to be the dishonest, manipulative, vindictive person his ENTIRE senior staff had numerous complaints about.  We, the senior staff who reported him back in May 2022 for multiple acts [of] City policy violations, retaliation, racism and sexism finally feel vindicated."

481.     As Banks knew at the time, all three parts of this statement were false.

482.     First, rather than vindicating complaints of retaliation, racism, and sexism, the report explicitly found these complaints were "unsubstantiated."

483.     Second, a wide range of "senior staff" in the agency – including Mike Higgins, Will Cleveland, De'Jon Hall, Vanessa Cheeks, and others – never made a complaint about Mr. Reynolds.

484.     Third, the "report" included no findings or conclusions suggesting Mr. Reynolds was dishonest, manipulative, or vindictive.

485.     This statement conveyed that Mr. Reynolds was, in connection with his profession as a city administrator and attorney, a liar and abusive manager.

486.     Banks' defamatory statement was made maliciously, as a retaliatory effort to punish Mr. Reynolds for resisting official misconduct – including by having filed, in May 2022, a complaint about Banks sexually harassing another City employee.

I.      **Overriding His Staff's Wishes and His Statutory Rights, Defendants Terminate Mr. Reynolds Without Cause**

487.    On November 17, 2022 – one day after the City published the "report" – the PAB's Board held a meeting to address Mr. Reynolds's complaint.

488.    At a press conference called by the PAB's union just before the Board meeting, Mr. Reynolds's employees decried the biased nature of the report and its call for Mr. Reynolds to be terminated. The union issued a demand that the City "reinstate" Mr. Reynolds immediately.

489.    The Board's meeting began with PAB union members calling on Board members to meet their "demand." Rather than responding to this request, Board members voted to enter an "executive session" to discuss a "personnel matter."

490.    Hours later, Mr. Reynolds received a phone call from the PAB Board's Chair, Knox. Knox told Mr. Reynolds that the Board had voted to terminate him. Knox refused to inform Mr. Reynolds the basis for his suspension, only noting that the vote had not been unanimous.

491.    On information and belief, there are no records or minutes from the November 17, 2022 meeting that state why Mr. Reynolds was terminated.

492.    The following day, November 18, 2022, the City sent Mr. Reynolds a letter that read: "Effective November 17, 2022, your employment as Executive Director of the Police Accountability Board has been terminated." The letter gave no explanation as to why Mr. Reynolds had been terminated.

493.    As Executive Director, Mr. Reynolds could only be "remove[d]" for "good cause," according to Section 18-6(C)(5) of the Rochester City Charter.

494.    Given this good cause protection, Defendants owed Mr. Reynolds an extensive set of pre-termination and post-termination due process.

495.     In the 24-hour window between informing Mr. Reynolds of specific notice of the charges or potential grounds for discipline being considered and terminating him, the City failed to explain the underlying evidence and witnesses – including by, among other things, redacting countless pages of the report.

496.     During the same 24-hour window, Defendants ignored a request from Mr. Reynolds's attorneys made via email to the PAB Board, requesting that he be given an opportunity to address the claims against him and clear his name.

497.     In addition to withholding pre-termination due process, Defendants withheld from Mr. Reynolds essentially all post-termination due process he was owed.

498.     For example, Defendants still have not told Mr. Reynolds the reasons for his termination. Nor have they held an evidentiary hearing before a neutral arbiter allowing him to present evidence and cross-examine witnesses. Nor have they provided him with any information about – let alone any form of – post-termination appeal.

499.     In sum, Defendants have entirely ignored Mr. Reynolds's due process rights – rights which, if he had been allowed to exercise, would have allowed him to retain his job and helped him restore his public reputation.

## IX.     DEFENDANTS REFUSE TO SUSPEND, LET ALONE TERMINATE, A SIMILARLY SITUATED EMPLOYEE

500.     Perhaps the clearest proof that Defendants subjected Mr. Reynolds to a retaliatory suspension, investigation, and termination comes through their treatment of an employee in a remarkably similar situation to Mr. Reynolds – namely, his temporary successor as Executive Director, Bascoe.

501.    Shortly after Bascoe was appointed as interim Executive Director on May 25, 2022, Bascoe faced many complaints of either a similar or more serious nature than those raised against Mr. Reynolds.

502.    During his tenure as Executive Director, employees filed formal complaints against Bascoe, accusing him of, *inter alia*, being intoxicated during work meetings, sexual harassment, using racial slurs, going on vacation on City time, falsifying time cards, using government resources for personal use, and retaliating against those who raised complaints against him. Indeed, the complaints against Bascoe were so widespread that PAB employees formed a union in direct response to his mistreatment. In November 2022, the union submitted a complaint to the City about Bascoe engaging in "blatant abuse of power, squandering of public funds, and corruption."

503.    As one PAB employee later stated, "I was struck by how mild and limited the allegations against Conor were compared to the ones that more than 18 staff members came together to voice about Duwaine [Bascoe] . . . [which] are far broader and more egregious."

504.    Despite these complaints, Bascoe was never suspended. Nor was he ever subject to a gag order, the leak of his personnel file, defamatory statements, termination, or any of the other punishments Defendants imposed on Mr. Reynolds.

505.    Instead, Defendants took what PAB Chair Larry Knox called a "relaxed" approach to staff complaints, as "things can be a little off sometimes" when an organization is "just starting off." As part of this "relaxed" approach, Nickoloff was tasked with drafting a "seven-page potential plan" that would help "figur[e] out activities and things to help address" staff complaints. These "activities" included "a Fun Day Friday," "board games," an "internal newsletter," and "playing cards" with Bascoe.

506.     Rather than punish Bascoe, Defendants eventually asked a management consulting firm, CCSI, to conduct "sessions" with employees in July 2022 to help address the agency's "culture." In a summary report, CCSI noted that the "responses" to the sessions included complaints about "secrecy," "punishment," "dishonesty," and "using positions of political power to further personal/career ambitions." In a concluding recommendation, CCSI asked to conduct a third "session" with employees, with "PAB leadership not be in attendance" because of the complaints employees had made about them.

507.     Despite these findings, Defendants took no action against Banks, Bascoe, Campbell, Maye, Nickoloff, or Setel. "Not a question asked of staff to get to the bottom of anything," one employee said. "Not an investigation or observations in here in the office. Nothing."

508.     Given this refusal to act, in early October 2022, the majority of the PAB's workers demanded that the PAB's Board meet with them to hear their complaints. While the Board had been quick to schedule an emergency meeting between all Board members and all employees who had raised "concerns" about Mr. Reynolds in May, employees demanding to speak about Bascoe in October said Defendants "den[ied] us the opportunity to collectively express our concerns to the entire Board." Setel, who had organized and spearheaded the emergency meeting with employees in May, openly voted against a proposal to hold a similar meeting on October 6, 2022. As Knox can be heard stating in an audio recording made later that evening, the Board decided "we wouldn't meet with all the people who signed [complaints]" against Bascoe.

509.     And while Defendants refused to allow Mr. Reynolds to speak with Board members before they heard from employees with "concerns" in May, Defendants' immediate

response to the complaints made in October was *not* to hear from complainants, but instead hold a 45 meeting with Bascoe on October 6, 2022 to give him a chance to – in the words of one employee – "respond to our accusations."

510.    In the context of the "concerns" raised about Mr. Reynolds, Defendants told state investigators that the Board rightfully "determined that it would proceed with investigating the staff complaints" through "listening sessions." But in the context of complaints raised about Bascoe, Defendants said the Board had an obligation to *not* investigate. As Setel told employees during a public meeting held on December 1, 2022, "Our role at the Board is not to investigate HR complaints."

511.    On October 11, 2022, the PAB's workers formed a union and issued a public demand for Bascoe to be fired "immediately" – and for workers to be given a role in "any future decisions" related to reinstating Mr. Reynolds. In response, Defendants continued their "relaxed" approach to the complaints against Bascoe, with City Council's leadership stating that Bascoe should "not be removed."

512.    In a press release, Defendants outlined a "plan" that, rather than investigating or suspending Bascoe, involved "hir[ing] a mediator to address internal agency issues" and "creat[ing] an internal task force" to "address issues around organizational culture." The "task force" proposed that employees resolve their issues by, *inter alia*, attending a "team-building ropes course" with Bascoe at a local summer camp.  Tellingly, Defendants waited until *after* they had decided to terminate Mr. Reynolds to address or investigate the complaints about Bascoe. How they did so is further proof that Mr. Reynolds was subject to disparate treatment.

513.    Just as they had done in Mr. Reynolds's case, Defendants hired an outside law firm to help the City investigate the claims against Bascoe. Unlike the "investigation" into Mr.

Reynolds, however, Defendants did not publicly broadcast the one into Bascoe. They did not give public updates on its progress. They never leaked or publicized any of the underlying allegations. And they never released the investigation's final report or ultimate conclusions.

514.   While Mr. Reynolds's "defend[ing] his actions" led to public censure and punishment, Defendants encouraged Bascoe to put on a defense. Indeed, PAB Chair Knox told countless individuals on or around October 11, 2022 that Bascoe deserved a chance to "defend himself."

515.   Whatever the City ultimately concluded about Bascoe, they refused to terminate him, instead allowing him to quietly resign on his own terms – and issuing statements of support in his honor.

516.   And while the City has been conspicuously silent about Bascoe since he left his employment, Defendants have continued to make public and disparaging comments about Mr. Reynolds after his termination, including through a letter signed by six City Councilmembers – Willie Lightfoot, Mitch Gruber, LaShay Harris, Michael Patterson and Jose Peo – telling "the Community" that Mr. Reynolds "grossly mismanaged this new agency and wasted tax-payer dollars."

517.   The difference between Bascoe and Mr. Reynolds, two similarly situated employees, is simple: Bascoe never filed a sexual harassment complaint against a powerful and beloved City official. Mr. Reynolds did.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Discrimination in Violation of Title VII of the Civil Rights Act of 1964)**
*Against the City*

518.    Mr. Reynolds hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

519.    Defendant City has discriminated against Mr. Reynolds on the basis of both his gender and sexual orientation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") by, inter alia, subjecting him to an unlawful hostile work environment, quid pro quo sexual harassment and discriminatory disparate treatment.

520.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of Title VII, Mr. Reynolds has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

521.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of Title VII, Mr. Reynolds has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, loss of self-confidence and emotional pain and suffering, for which he is entitled to an award of monetary relief and other relief.

522.    Defendant's unlawful discriminatory actions constitute malicious, willful and wanton violations of Title VII for which Mr. Reynolds is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Discrimination in Violation of the Equal Protection Clause)
#### *Against the City and Shani Wilson*

523.    Mr. Reynolds hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

524.    Defendant City, through and with agents acting under color of state law and in their individual capacity, including Defendant Wilson, as well as Defendant Wilson individually, have discriminated against Mr. Reynolds on the basis of both his gender and sexual orientation in violation of the Equal Protection Clause by, inter alia, subjecting him to an unlawful hostile work environment, quid pro quo sexual harassment and discriminatory disparate treatment. Defendants City and Wilson also aided and abetted this unlawful conduct.

525.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the Equal Protection Clause, Mr. Reynolds has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

526.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the Equal Protection Clause, Mr. Reynolds has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, loss of self-confidence and emotional pain and suffering, for which he is entitled to an award of monetary relief and other relief.

527.    Defendants' unlawful discriminatory actions constitute malicious, willful and wanton violations of the Equal Protection Clause for which Mr. Reynolds is entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION
**(Discrimination in Violation of the New York State Human Rights Law)**
***Against the City and Shani Wilson***

528.    Mr. Reynolds hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

529.    Defendants City and Wilson have discriminated against Mr. Reynolds on the basis of both his gender and sexual orientation in violation of the New York State Human Rights Law ("NYSHRL") by, inter alia, subjecting him to an unlawful hostile work environment, quid pro quo sexual harassment and discriminatory disparate treatment.  Defendants City and Wilson also aided and abetted this unlawful conduct.

530.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Mr. Reynolds has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

531.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Mr. Reynolds has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, loss of self-confidence and emotional pain and suffering, for which he is entitled to an award of monetary relief and other relief.

532.    Defendants' unlawful discriminatory actions constitute malicious, willful and wanton violations of the NYSHRL for which Mr. Reynolds is entitled to an award of punitive damages.

### FOURTH CAUSE OF ACTION
### (Retaliation in Violation of Title VII)
### *Against the City*

533.    Plaintiff hereby repeats, reiterates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

534.    By the actions described above, among others, the City retaliated against Mr. Reynolds in violation of Title VII because he protested unlawful discrimination.

535.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of Title VII, Mr. Reynolds has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

536.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of Title VII, Mr. Reynolds has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, loss of self-confidence and emotional pain and suffering, for which he is entitled to an award of monetary relief and other relief.

537.    Defendant's unlawful retaliatory actions constitute malicious, willful and wanton violations of Title VII for which Mr. Reynolds is entitled to an award of punitive damages.

### FIFTH CAUSE OF ACTION
### (Retaliation in Violation of the Equal Protection Clause)
### *Against the City*

538.    Plaintiff hereby repeats, reiterates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

539.    By the actions described above, among others, Defendant City, through and with agents acting under color of state law and in their individual capacity, including the remaining

Defendants, as well as the remaining Defendants individually, retaliated against Mr. Reynolds in violation of the Equal Protection Clause because he protested unlawful discrimination.

540.     As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the Equal Protection Clause, Mr. Reynolds has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

541.     As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the Equal Protection Clause, Mr. Reynolds has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, loss of self-confidence and emotional pain and suffering, for which he is entitled to an award of monetary relief and other relief.

542.     Defendant's unlawful retaliatory actions constitute malicious, willful and wanton violations of the Equal Protection Clause for which Mr. Reynolds is entitled to an award of punitive damages.

### SIXTH CAUSE OF ACTION
**(Retaliation in Violation of the First Amendment)**
*Against all Defendants*

543.     Plaintiff hereby repeats, reiterates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

544.     By the actions described above, among others, Defendants retaliated against Mr. Reynolds in violation of the First Amendment because he engaged in protected speech.

545.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the First Amendment, Mr. Reynolds has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

546.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the First Amendment, Mr. Reynolds has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, loss of self-confidence and emotional pain and suffering, for which he is entitled to an award of monetary relief and other relief.

547.    Defendants' unlawful retaliatory actions constitute malicious, willful and wanton violations of the First Amendment for which Mr. Reynolds is entitled to an award of punitive damages.

## SEVENTH CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
#### *Against all Defendants*

548.    Plaintiff hereby repeats, reiterates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

549.    By the actions described above, among others, Defendants retaliated against Mr. Reynolds in violation of the NYSHRL because he protested unlawful discrimination.

550.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Mr. Reynolds has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

551.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Mr. Reynolds has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation,

embarrassment, stress and anxiety, loss of self-esteem, loss of self-confidence and emotional

pain and suffering, for which he is entitled to an award of monetary relief and other relief.

552.    Defendants' unlawful retaliatory actions constitute malicious, willful and wanton

violations of the NYSHRL for which Mr. Reynolds is entitled to an award of punitive damages.

## EIGHTH CAUSE OF ACTION
### (Retaliation in Violation of the New York Civil Service Law § 75-b)
#### *Against the City*

553.    Plaintiff hereby repeats, reiterates and realleges each and every allegation in the

preceding paragraphs as if set forth fully herein.

554.    By the actions described above, among others, the City retaliated against Mr.

Reynolds in violation of the New York Civil Service Law § 75-b ("§ 75-b") because he protested

unlawful discrimination and other unlawful conduct.

555.    As a direct and proximate result Defendant's unlawful retaliatory conduct in

violation of § 75-b, Mr. Reynolds has suffered, and continues to suffer, monetary and/or

economic harm for which he is entitled to an award of monetary damages and other relief.

556.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in

violation o § 75-b, Mr. Reynolds has suffered and continues to suffer severe mental anguish and

emotional distress, including but not limited to depression, humiliation, embarrassment, stress

and anxiety, loss of self-esteem, loss of self-confidence and emotional pain and suffering, for

which he is entitled to an award of monetary relief and other relief.

## NINTH CAUSE OF ACTION
### (Defamation *Per Se*)
#### *Against the City and Campbell*

557.    Mr. Reynolds hereby repeats and re-alleges each and every allegation in all of the

preceding paragraphs as if fully set forth herein.

558.    As described above, on October 12, 2022, Defendants City and Campbell drafted and published a statement on May 8, 2022 that stated Mr. Reynolds caused such a "heightened sense of anxiety, apprehension in coming to work, and fear of retaliation"—for both the "senior staff" of the PAB and the agency's 30 other "staff"—that he had to be "investigated" and "placed on a paid administrative leave."

559.    The statement was false, and Defendants knew or should have known that it was false when it was published.

560.    The statement was made with actual malice, ill will, spite, and with wanton, reckless, or willful disregard for its injurious effects on Mr. Reynolds and his rights.

561.    As a direct and proximate result of Defendants' defamatory statement, Mr. Reynolds has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

562.    As a direct and proximate result of Defendants' defamatory statement, Mr. Reynolds has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, loss of self-confidence and emotional pain and suffering, for which he is entitled to an award of monetary relief and other relief.

563.    Defendants' unlawful defamatory statement caused Mr. Reynolds to suffer reputational harm by exposing him to public contempt, hatred, ridicule, aversion and disgrace.

564.    Defendants' unlawful defamatory statement was made with actual malice and Mr. Reynolds is entitled to an award of punitive damages.

## TENTH CAUSE OF ACTION
### (Defamation *Per Se*)
### *Against the City and Wilson*

565.     Mr. Reynolds hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

566.     As described above, Defendants City and Wilson drafted and published a statement on June 7, 2022 that Mr. Reynolds's complaint of sexual harassment and retaliation against Wilson was "unequivocally false" and "retaliat[ory]."

567.     The statement was false, and Defendants knew or should have known it was false when it was made.

568.     The statement was made with actual malice, ill will, spite, and with wanton, reckless, or willful disregard for its injurious effects on Mr. Reynolds and his rights.

569.     As a direct and proximate result of Defendants' defamatory statement, Mr. Reynolds has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

570.     As a direct and proximate result of Defendants' defamatory statement, Mr. Reynolds has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, loss of self-confidence and emotional pain and suffering, for which he is entitled to an award of monetary relief and other relief.

571.     Defendants' unlawful defamatory statement caused Mr. Reynolds to suffer reputational harm by exposing him to public contempt, hatred, ridicule, aversion and disgrace.

572.     Defendants' unlawful defamatory statement was made with actual malice and Mr. Reynolds is entitled to an award of punitive damages.

## ELEVENTH CAUSE OF ACTION
### (Defamation *Per Se*)
### *Against the City, Bascoe, Nickoloff, Setel and Banks*

573.     Mr. Reynolds hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

574.     As described above, on October 12, 2022, Defendants City, Bascoe, Nickoloff, Setel and Banks drafted and published a press release titled "PAB Calls for State Investigation into Former Executive Director."

575.     The press release said that the New York State Attorney General needed to investigate Mr. Reynolds, as he had committed the "crime[s]" of "[c]ollusion and interference with a governmental investigation" by "holding alleged meetings with current and former PAB staff, members of the Police Accountability Board Alliance, and others including a meeting at his home this past weekend with former staff and other parties."

576.     The statement was false, and Defendants knew or should have known it was false when it was made.

577.     The statement was made with actual malice, ill will, spite, and with wanton, reckless, or willful disregard for its injurious effects on Mr. Reynolds and his rights.

578.     As a direct and proximate result of Defendants' defamatory statement, Mr. Reynolds has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

579.     As a direct and proximate result of Defendants' defamatory statement, Mr. Reynolds has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of

self-esteem, loss of self-confidence and emotional pain and suffering, for which he is entitled to

an award of monetary relief and other relief.

580.    Defendants' unlawful defamatory statement caused Mr. Reynolds to suffer

reputational harm by exposing him to public contempt, hatred, ridicule, aversion and disgrace.

581.    Defendants' unlawful defamatory statement was made with actual malice and Mr.

Reynolds is entitled to an award of punitive damages.

## TWELFTH CAUSE OF ACTION
### (Defamation *Per Se*)
### *Against the City and Wilson*

582.    Mr. Reynolds hereby repeats and re-alleges each and every allegation in all of the

preceding paragraphs as if fully set forth herein.

583.    As described above, Defendants have admitted that Wilson repeatedly stated that

Mr. Reynolds was a "narcissistic abuser."

584.    These statements were false, and Defendants knew or should have known they

were false when they were made.

585.    These statements were made with actual malice, ill will, spite, and with wanton,

reckless, or willful disregard for its injurious effects on Mr. Reynolds and his rights.

586.    As a direct and proximate result of Defendants' defamatory statements, Mr.

Reynolds has suffered, and continues to suffer, monetary and/or economic harm for which he is

entitled to an award of monetary damages and other relief.

587.    As a direct and proximate result of Defendants' defamatory statements, Mr.

Reynolds has suffered and continues to suffer severe mental anguish and emotional distress,

including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of

self-esteem, loss of self-confidence and emotional pain and suffering, for which he is entitled to

an award of monetary relief and other relief.

588.    Defendants' unlawful defamatory statements caused Mr. Reynolds to suffer

reputational harm by exposing him to public contempt, hatred, ridicule, aversion and disgrace.

589.    Defendants' unlawful defamatory statements were made with actual malice and

Mr. Reynolds is entitled to an award of punitive damages.

**THIRTEENTH CAUSE OF ACTION**
**(Defamation *Per Se*)**
***Against Banks***

590.    Mr. Reynolds hereby repeats and re-alleges each and every allegation in all of the

preceding paragraphs as if fully set forth herein.

591.    As described above, Banks stated: "This investigation has revealed Conor to be

the dishonest, manipulative, vindictive person his ENTIRE senior staff had numerous complaints

about."

592.    This statement was false, and Banks knew or should have known it was false

when they were made.

593.    This statement wase made with actual malice, ill will, spite, and with wanton,

reckless, or willful disregard for its injurious effects on Mr. Reynolds and his rights.

594.    As a direct and proximate result of Banks's defamatory statement, Mr. Reynolds

has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to

an award of monetary damages and other relief.

595.    As a direct and proximate result of Banks's defamatory statements, Mr. Reynolds

has suffered and continues to suffer severe mental anguish and emotional distress, including but

not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem,

loss of self-confidence and emotional pain and suffering, for which he is entitled to an award of monetary relief and other relief.

596.     Banks's unlawful defamatory statement caused Mr. Reynolds to suffer reputational harm by exposing him to public contempt, hatred, ridicule, aversion and disgrace.

597.     Banks's unlawful defamatory statement was made with actual malice and Mr. Reynolds is entitled to an award of punitive damages.

**FOURTEENTH CAUSE OF ACTION**
**(Deprivation of Property Under the 14th Amendment (via Section 1983))**
***Against the City***

598.     Mr. Reynolds hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

599.     Mr. Reynolds had a property interest in his continued employment as executive director of the PAB, as he could only be removed from that position for "good cause" according to Section 18-6(C)(5) of the Charter of the City.

600.     Defendant City deprived Mr. Reynolds of this constitutionally protected interest when it terminated him on November 18, 2022.

601.     Before terminating Mr. Reynolds, the City failed to give Mr. Reynolds the requisite due process by, among other things, refusing to give him: (i) specific notice of the charges or potential grounds for discipline being considered; (ii) an explanation of the evidence and witnesses pertaining to the potential discipline; and (iii) an informal opportunity to present his response to the charges to the decision maker.

602.     After terminating Mr. Reynolds, the City failed to give Mr. Reynolds the requisite due process by, among other things, refusing to: (i) inform him of the reasons for his termination; (ii) hold an evidentiary hearing; and (iii) and provide him with any form of appeal process.

603.     As a direct and proximate result of Defendant's unlawful conduct in violation of the Equal Protection Clause of the 14th Amendment, Mr. Reynolds has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

604.     As a direct and proximate result of Defendant's unlawful conduct in violation of the Equal Protection Clause of the 14th Amendment, Mr. Reynolds has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, loss of self-confidence and emotional pain and suffering, for which he is entitled to an award of monetary relief and other relief.

605.     Defendant engaged in these practices with malice and with reckless indifference to Mr. Reynolds's federally protected rights.

## FIFTEENTH CAUSE OF ACTION
**(Deprivation of Liberty—Stigma-Plus—Under the 14th Amendment (via Section 1983))**
***Against the City***

606.     Mr. Reynolds hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

607.     At the time of his termination, Mr. Reynolds had a liberty interest in his freedom to engage in any of the common occupations of life, including by defending his good name, reputation, honor and integrity from public charges from a government employer that he acted dishonestly and immorally.

608.     Defendant City deprived Mr. Reynolds of this constitutionally protected interest when, in the course of terminating him, it made statements about him on or about June 8, 2022, on or about October 18, 2022, and on or about November 16, 2022.

609.     These statements were made public when City officials disseminated them to members of the media and published them on government-owned websites.

610.     These statements were false, as proven by, among other things, the City's own admissions about their falsehood, hyperbolic character and unsubstantiated nature.

611.     These statements were sufficiently derogatory to injure Mr. Reynolds's reputation and deprive him of the freedom to take advantage of other employment opportunities, as they imputed, among other things, that Mr. Reynolds was such a "poor leader" and engaged in such widespread managerial misconduct so pervasive and severe that he could not be employed in a role allowing him to supervise others.

612.     Defendant City knowingly imposed this harm on Mr. Reynolds, as they have admitted that the release of the relevant statements subject employees like Mr. Reynolds to an "unwarranted invasion of privacy."

613.     In terminating Mr. Reynolds in close temporal proximity to the public release of these statements, the City implicitly affirmed the truth of these false statements.

614.     The City gave Mr. Reynolds neither notice of the reasons for his termination nor, as requested, an opportunity to clear his name.

615.     As a direct and proximate result of Defendant's unlawful conduct in violation of the Equal Protection Clause of the 14th Amendment, Mr. Reynolds has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

616.     As a direct and proximate result of Defendant's unlawful conduct in violation of the Equal Protection Clause of the 14th Amendment, Mr. Reynolds has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression,

humiliation, embarrassment, stress and anxiety, loss of self-esteem, loss of self-confidence and emotional pain and suffering, for which he is entitled to an award of monetary relief and other relief.

617.    Defendant engaged in these practices with malice and with reckless indifference to Mr. Reynolds's federally protected rights.

**SIXTEENTH CAUSE OF ACTION**
**(Intentional Infliction of Emotional Distress)**
***Against all Defendants***

618.    Mr. Reynolds hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

619.    Defendants' aforementioned conduct constituted behavior toward Mr. Reynolds that was so outrageous in character and extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

620.    This conduct was intended to cause (and/or disregarded the substantial probability of causing) Mr. Reynolds severe emotional distress.

621.    This conduct caused Mr. Reynolds to suffer the abovementioned serious and permanent personal injuries.

622.    Mr. Reynolds is entitled to recover the full extent of the damages caused by this behavior, including such punitive damages as may be allowed by law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in his favor and against Defendants, containing the following relief:

A.     A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State of New York;

B.     An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.     An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, seniority, and other benefits of employment;

D.     An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress;

E.     An award of punitive damages, in an amount to be determined at trial;

F.     Prejudgment interest on all amounts due;

G.     Reinstatement;

H.     An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and

I.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated:  August 30, 2023
        New York, New York                **WIGDOR LLP**

                                          By: _____
                                               Michael J. Willemin

                                          85 Fifth Avenue
                                          New York, NY 10003
                                          Telephone: (212) 257-6800
                                          Facsimile: (212) 257-6845
                                          mwillemin@wigdorlaw.com

                                          *Attorneys for Plaintiff*


                                          **SCHNITTER CICCARELLI MILLS PLLC**


                                          By: */s/ Ryan J. Mills*
                                               Ryan J. Mills

                                          8685 Sheridan Drive
                                          Williamsville, NY 14221
                                          Telephone: (716) 639-7690
                                          Facsimile: (716) 639-7317
                                          rmills@scm-law.com

                                          *Attorneys for Plaintiff*